FRANK E. SELLERS and POLLY M. SELLERS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent. FRANK E. SELLERS, TRANSFEREE OF ASSETS OF NORPACO BUILDERS, INC., TRANSFEROR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent. NORPACO BUILDERS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Sellers v. Commissioner
Docket Nos. 1504-74 1505-74 4530-74
United States Tax Court
T.C. Memo 1977-70; 1977 Tax Ct. Memo LEXIS 368; 36 T.C.M. (CCH) 305; T.C.M. (RIA) 770070; March 21, 1977, Filed *368 1. The Commissioner determined that Frank E. Sellers and Norpaco Builders, Inc., were the principals in several real estate sales during 1965 and 1966 and that Frank E. Sellers is liable as a transferee for any taxes owed by Norpaco for those years. Frank E. Sellers was the president and sole stockholder of Norpaco. The corporation maintained no separate books and records, and its financial transactions were conducted through Frank E. Sellers' bank account. Held, the taxpayers failed to establish that they were acting only as agents or nominees for another in their connection with the pertinent real estate sales. Accordingly, amounts of income determined, additions to tax sustained, and transferee liability established. 2. Frank E. Sellers was a general partner in Sellers Enterprises, a limited partnership, during 1964 through 1966. The partnership incurred taxable losses during all three years. Held,Frank E. Sellers' distributive share of the taxable losses determined in accordance with local law because of the partners' failure to reach a bona fide agreement as to the sharing of economic losses in the event that such should occur. 3. Held further, taxpayers filed to establish *369 their entitlement to certain other deductions claimed on their individual returns or to show cause why additions to tax determined by the Commissioner should not be upheld. Frank E. Sellers, pro se. Robert A. Johnson, for the respondent. BRUCE MEMORANDUM FINDINGS OF FACT AND OPINION BRUCE, Judge: In these cases, which were consolidated for trial, briefing, and opinion pursuant to a joint motion of the parties, respondent determined deficiencies in, and additions to, Federal income tax, and transferee liability of the petitioners, for the years and in the amounts as follows: Additions to Tax Year
Deficiency
Sec. 6651(a)
[1] Sec. 6653(a) Docket No. 1504-74 - Frank E. Sellers and
Polly M. Sellers, petitioners
1964
$3,210.72
$802.68
$173.50
1965
597.25
29.86
1966
598.66
29.93
Docket No. 4530-74 - Norpaco Builders, Inc., petitioner
1965
800.80
160.16
40.04
1966
792.00
198.00
39.60
Docket No. 1505-74 - Frank E. Sellers, Transferee of
assets of Norpaco Builders, Inc.,
Transferor, petitioner
Transferee Liability
$2,030.60
We are asked to resolve the following questions: (1) *370 Did Norpaco Builders, Inc., realize unreported income from the sale of real estate in 1965 and 1966; (2) Did Norpaco Builders, Inc., fail to timely file Federal income tax returns for 1965 and 1966 without reasonable cause, thereby making the addition to tax imposed by section 6651(a) applicable for those years; (3) Did Norpaco Builders, Inc., fail to maintain books and records and properly prepare its Federal income tax returns for 1965 and 1966 due to negligence or intentional disregard of rules and regulations, thereby making the addition to tax imposed by section 6653(a) applicable for those years; (4) Was the statutory notice of deficiency issued to Norpaco Builders, Inc., timely under the limitations provisions of section 6501; [2]
(5) Is Frank Sellers liable as a transferee for any tax and additions to tax due from Norpaco Builders, Inc., for the years 1965 and 1966; (6) Did Frank and Polly Sellers realize unreported dividend income from Norpaco Builders, Inc., *371 in 1965 and 1966; (7) What was Frank Sellers' distributive share, in 1964, 1965, and 1966, of the partnership losses of Sellers Enterprises, a limited partnership in which he was a general partner; (8) Are Frank and Polly Sellers entitled to a net operating loss carryover deduction on their individual income tax returns for 1964, 1965, and 1966: (9) Are Frank and Polly Sellers entitled to deductions for bad debts and unreimbursed expenses, in excess of that allowed by respondent, on their individual income tax returns for 1965 and 1966; [3]
(10) Are Frank and Polly Sellers entitled to a deduction for gas and oil expenses incurred in connection with a trade or business, in excess of that allowed by respondent, on their individual income tax return for 1965; [3]
(11) Did Frank and Polly Sellers realize unreported income from *372 the sale of real estate in 1965; (12) Did Frank and Polly Sellers fail to timely file their joint individual income tax return for 1964 without reasonable cause, thereby making the addition to tax imposed by section 6651(a) applicable for that year; (13) Did Frank and Polly Sellers fail to maintain books and records and properly prepare their joint individual income tax returns for 1964 through 1966 due to negligence or intentional disregard of rules and regulations, thereby making the addition to tax imposed by section 6653(a) applicable for those years. The answers to questions (1), (2), (3), (5), (6), and (11) are dependent in the first instance on whether Frank Sellers and Norpaco Builders, Inc., were acting merely as agents or nominees for Charles D. Norton in their connection with several real estate transactions hereinafter discussed, and those issues will be considered together. With regard to issue (7), the case takes on a strange twist. Respondent maintains that Frank Sellers is entitled to deduct approximately 80 percent of the losses of Sellers Enterprises for 1964 through 1966, while the taxpayer claims none of the losses. Because the notice of deficiencies used 40 *373 percent of the partnership losses as Frank Sellers' distributive share in computing his income tax deficiencies, a decision on the issue in favor of respondent will greatly reduce or extinguish the deficiencies asserted against Frank and Polly Sellers. The record on which we must decide the issues presented is quite confusing. This confusion stems largely from the complex manner in which Frank Sellers pursued his business interests and the sparse evidence introduced in explanation thereof. In the interest of clarity, therefore, at the risk of being redundant and also of appearing theatrical, we are beginning our discussion of these cases with an introduction of the various persons and entities involved herein. The cast of characters includes: Frank E. Sellers: petitioner; real estate broker and attorney during the years in issue; the moving force in the activities giving rise to this litigation; president of Sellers Realty Corporation, Norpaco Builders, Inc., and various other corporations; sole stockholder of record in Norpaco Builders, Inc.; general partner in Sellers Enterprises, a limited partnership. Polly M. Sellers: petitioner; wife of Frank E. Sellers; a party to this litigation *374 solely by reason of having cosigned joint individual income tax returns with her husband for 1964, 1965, and 1966. John G. Sellers: brother of Frank E. Sellers; doctor with a very high income; limited partner in Sellers Enterprises, a limited partnership. Florence B. Sellers: wife of John G. Sellers; limited partner in Sellers Enterprises, a limited partnership. Sellers Realty Corporation: corporation chartered by Frank E. Sellers in the early 1960's; lost its charter due to non-payment of franchise taxes sometime prior to its involvement in this case; defunct corporation used to take, hold, and transfer title to certain real property involved in this case. Norpaco Builders, Inc.: petitioner; Virginia corporation chartered January 11, 1965; charter revoked for non-payment of franchise taxes June 2, 1969; president and sole stockholder of record, Frank E. Sellers; involved in several real estate transactions forming the basis of this litigation; maintained no bank account nor corporate books and records. Sellers Enterprises: limited partnership; general partner, Frank E. Sellers; limited partners, John G. and Florence B. Sellers; formed April 1, 1964, primarily for real estate investments; *375 suffered losses in 1964, 1965, and 1966, of which the distributive shares allocable to Frank Sellers are in issue. Charles D. Norton: business associate of Frank E. Sellers, the exact relationship unclear from the record; alleged by Frank Sellers to be the principal in the real estate transactions involving Sellers Realty and Norpaco which form the basis for a portion of this litigation; neither an officer nor stockholder of record of either Sellers Realty or Norpaco; president of Norton Building Corporation and Norton Construction Co., Inc.; deceased at the time of trial. William A. Rhyne: identified on several exhibits introduced into evidence as the secretary or assistant secretary of Sellers Realty Corporation, Frank E. Sellers, Inc., Norton Building Corporation, and Norton Construction Co., Inc.
FINDINGS OF FACT The stipulation of facts filed by the parties and the exhibits attached thereto are incorporated herein by this reference. Petitioners Frank E. Sellers and Polly M. Sellers are husband and wife who resided in Verona, Virginia, on the date the petitions were filed herein. They filed joint individual income tax returns with the Internal Revenue Service at Richmond, *376 Virginia, for the years 1960 through 1966. Polly M. Sellers is a party to this litigation solely by reason of her having cosigned the joint returns. Petitioner Norpaco Builders, Inc., was a Virginia corporation during the taxable years in issue. It was chartered on January 11, 1965, but its corporate charter was revoked by the State on June 2, 1969. The corporation filed a corporate income tax return for the calendar year 1965 with the Internal Revenue Service at Richmond, Virginia. It did not file an income tax return for 1966. Frank Sellers was the president of Norpaco Builders, Inc., during 1965 and 1966, and he is its representative in the litigation presently before the Court. Hereinafter we will refer to Norpaco Builders, Inc., as Norpaco and to Frank Sellers as petitioner. During 1964 through 1966, petitioner was a real estate broker and an attorney practicing law primarily in the real estate field. His involvement in various real estate ventures forms the basis for several of respondent's determinations in these cases. Inasmuch as the issues relate to distinct series of facts, our further factual findings will be segregated accordingly. A. Norpaco Builders. Inc., *377 and Related Issues
By a deed dated November 11, 1964, title to certain real property referred to as Fox Hall Manor was taken in the name of Sellers Realty Corporation from Lionel S. and Isabelle M. Cadorette. Sellers Realty was a corporation that had been chartered by petitioner in the early 1960's, but it had lost its charter for non-payment of franchise taxes prior to taking the deed. The purchase price of the property was $13,000. Fox Hall Manor was subdivided into Lots A and B. On January 19, 1965, Lot A was sold to Charles D. and Olive Landrum for $12,600. On March 11, 1965, Lot B was transferred from Sellers Realty to Norpaco. Deed stamps indicate that a state recording tax was paid on the transfer based on a value of $3,450 for Lot B. The deed was signed by Frank E. Sellers and William A. Rhyne as president and secretary, respectively, of Sellers Realty. During the time that Norpaco held title to the property, a house was constructed on the lot. On June 3, 1966, Lot B, as improved, was sold to David R. Simpson for $14,100. On March 9, 1965, three lots of real property referred to as Oceanview were purchased in the name of Norpaco from Philip E. Shaw. Revenue stamps *378 attached to the deed show the purchase price as $2,200. During the time that Norpaco held title to Oceanview, a house was constructed on the property. On July 21, 1965, Oceanview, as improved, was sold to John B. and Sally Holland for $18,750. Expenses of $1,357.55 were incurred by Norpaco on the sale. In addition to the aforementioned, Norpaco owned other real properties, subject to outstanding mortgages of undisclosed amounts, on which houses were constructed after 1966. The last lots were sold in 1974, and, at the time of trial, Norpaco no longer had any assets. Norpaco, by its president Frank Sellers, applied for and was granted a three-month extension of time in which to file its 1965 corporate income tax return. With the extension of time its return was due on or before June 15, 1966, but the return was not received by the Internal Revenue Service until September 16, 1966. Across the face of the return was written "No Operations." The asset segment of the balance sheet schedule on the return reflected cash of $30.80 and notes and accounts receivable of $6,036.62, while the liabilities and capital segment reflected accounts payable of $5,967.42 and common stock of $100.00. *379 In response to Question I(2) on page 3 of the return, relative to stock ownership of the corporation, appears the partially illegible notation "Frank E. Se…. Va 100%." As previously noted, Norpaco did not file a corporate income tax return for 1966. Nor did Norpaco maintain its own bank account or any corporate books and records for the years in issue. Norpaco's transactions were handled through what petitioner referred to as his "attorney" checking account. Although Charles D. Norton was deceased at the time of trial, a statement stipulated by the parties to be that of Charles D. Norton was introduced into evidence. The statement in its entirety appears below: TO WHOM IT MAY CONCERN: Frank E. Sellers, Attorney, set up for my financial protection, NORPACO Builders, Incorporated and houses were built in the name of this corporation on land purchased by the corporation in 1965 and 1966. There were several of these houses built in the Ocean View and other areas of Norfolk, Virginia. It has always been my understanding that there was no profit derived from these operations. It was my understanding at the time and still is that Mr. Sellers did not realize any profit of any nature *380 from the operations, nor was there profit on the sale of any of these houses. /s/ Charles D. Norton / Charles D. Norton The foregoing is correct: /s/ Frank E. Sellers / Frank E. Sellers
November 3, 1970 B. Sellers Enterprises
In 1964 Frank E. Sellers, John G. Sellers, and Florence B. Sellers, formed a limited partnership in the name of Sellers Enterprises for the purpose of investing in real estate. John Sellers was a doctor with a very high income, the brother of Frank Sellers, and the husband of Florence Sellers. Petitioner testified that the idea for formation of the partnership originated with him in 1963, when he became aware that "the Internal Revenue Service permitted real estate with mortgages to carry the basis thereof into the partners in a limited partnership." [4] *381 A certificate of limited partnership was signed by the partners on November 15, 1964, sometime after the start of business, and was filed in the Clerk's Office of the Corporation Court of the City of Norfolk, Virginia, on January 9, 1968. [5] The certificate of limited partnership provides in part as follows: ARTICLE IV
The name and place of residence of each partner and whether they are general or limited are as follows: (a) Frank E. Sellers 6801 Atlantic Ave., Va. Beach, Va. General (b) John G. Sellers 610 Barcliff Road, Norfolk, Va. Limited
(c) Florence B. Sellers 610 Barcliff Road, Norfolk, Va. Limited
* * *
ARTICLE VI
The initial amount of cash to be contributed by each limited partner is One Hundred and No/100 ($100.00) Dollars. ARTICLE VII
Additional contributions may be made by any limited partner at any time and from time to time. ARTICLE VIII
The time when the contribution of each limited partner is to be returned is as follows: (a) Upon the termination or dissolution of the partnership or the withdrawal of the limited partner from the partnership. (b) Upon death of the limited partner. The return of the initial contribution specified in Article VI to the limited partner shall *382 terminate such limited partner's interest in the partnership. ARTICLE IX
The share of profits or other compensation by way of income which each limited partner shall receive by reason of his contribution is as follows: (a) Such portion of the net income of the partnership as his initial and additional contribution relates to the total initial and additional contribution adjusted for the period of such contributions and the net income for such period. (b) The general partner shall have full power and authority to classify and allocate income and expenses and to distribute the same in his discretion. * * *
ARTICLE XIII
On the death of the general partner: * * *
(c) In the event no new partnership is formed, the estate of the general partner shall forthwith make suitable provision for partnership liabilities and return of capital of the limited partners and for the winding up of the affairs of the partnership. Assets and liabilities may be distributed in kind. On April 1, 1964, Sellers Enterprises purchased certain real property known as Pinedale Apartments, paying cash consideration of $43,850. Mortgages of $368,430.51 were existing on the property at that time. Effective that same *383 date, petitioner transferred a number of rental dwellings which he owned to the partnership. These properties were also subject to considerable mortgages and were generating tax losses for petitioner. Petitioner also transferred a number of personal liabilities to the partnership. Petitioner's capital account ledger sheet reflects additional contributions of assets and liabilities, the year-end running totals appearing as follows: Year
Liabilities
Assets
1964
$178,162.96
$177,680.92
1965
233,512.10
230,477.51
1966
233,512.10
230,477.51
John Sellers' capital account ledger sheet reflects contributions of assets and liabilities (or withdrawals), [6] the year-end running totals appearing as follows: Liabilities Year
(or Withdrawals)
Assets
1964
$25,900.00
$ 70,000.00
1965
42,732.53
103,747.91
1966
42,732.53
103,747.91
John Sellers' capital account was also charged with the losses sustained by Sellers Enterprises, as computed on the partnership returns, in the amounts of $23,393.66 for *384 1964, $33,076.25 for 1965, and $34,397.85 for 1966. The correct amounts of loss sustained by Sellers Enterprises for the years at issue, however, were stipulated to be as follows: Year
Amount
1964
$18,163.76
1965
34,154.80
1966
34,397.85 In 1964 petitioner received $2,000 from the partnership as a management fee; in 1965 and 1966 he received $7,500 each year. The partnership returns filed by Sellers Enterprises reflect the annual fee payments to petitioner. They also attribute each year's loss to John Sellers. The record is barren of evidence whether Florence Sellers ever contributed any capital or otherwise participated in the partnership beyond signing the certificate of limited partnership. C. Miscellaneous Issues re Frank and Polly Sellers.
1. Net operating loss deductions. In 1964, 1965, and 1966, petitioner claimed deductions for a net operating loss carryforward from 1962 and 1963 which totally offset his taxable income for 1964 and 1965 and extinguished all but $1,078.71 of his taxable income for 1966. In a prior audit of petitioner's income tax returns for the years 1959 through 1963, the Internal Revenue Service made adjustments to petitioner's income as reported for those *385 years, resulting in total absorption of his net operating losses prior to 1964. A deficiency was asserted for 1963 based on taxable income of $1,734.46. Petitioner did not contest the findings of the district director regarding his tax liability for the years 1959 through 1963, and consequently no statutory notice of deficiency was ever issued relative to those years. Counsel for respondent in this proceeding was under the impression that petitioner, by his duly appointed representative, had executed a Form 870, Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment, with respect to deficiencies asserted by the Internal Revenue Service for 1962 and 1963. At the conclusion of the trial in these cases, the record was left open to permit respondent to continue his search for the alleged Form 870, and if found, to offer it into evidence. However, respondent was unable to locate such a document. Petitioner was also unable to recall such document being executed. However, petitioner did introduce into evidence copies of the Internal Revenue Service's communications with him and his wife with respect to the findings for 1959 through *386 1963, including one cover letter dated July 27, 1970, which indicates that petitioner had accepted the findings contained in the attached reports. Furthermore, petitioner testified that the documents which he introduced accurately reflected the results of the audit of his income tax returns for 1959 through 1963, and that he did not appeal those findings. In support of his net operating loss carryforward deduction, petitioner introduced a combination journal and ledger for 1962 and 1963 and a document showing how the total loss carryover was used and preserved each year. He also testified that his income tax returns for each year were accurate as filed and that some specific adjustments made by the Internal Revenue Service were improper.In addition his income tax returns for 1960 through 1963 were introduced into evidence. 2. Business Bad Debt Deductions. On his 1965 income tax return petitioner claimed a business bad debt deduction of $4,727.41 and a deduction of $4,498.65 for "unreimbursed expenses advanced." On his 1966 return petitioner claimed a deduction of $432.18 for "unreimbursed expenses advanced." Respondent disallowed these deductions with the exception of $852.75 *387 for 1965. At trial petitioner introduced a list of items purportedly included in the 1965 deduction for bad debts and unreimbursed expenses. [7] He testified that all the items represented sums disbursed to or expended on behalf of clients in his law practice. Petitioner further stated that "most of them are uncollectible only because I have not collected them. Most of them are due from people who, if they were of a mind to pay them, could have paid them." Petitioner testified as to the substance of 4 of the 47 items listed in his trial exhibit and stated that they were typical of the other items. His testimony indicated that there was no correlation between the time when the accounts may have become uncollectible and the time he decided to deduct them on his 1965 return. Petitioner introduced no evidence with regard to the deduction disallowed for 1966. 3. Additions to tax. Petitioner applied for and was granted several extensions of time from April 15, 1965, to October 15, 1965, in which to file *388 his 1964 individual income tax return. His last application for an additional extension of time was denied because the maximum allowable extension had been previously granted. Petitioner's 1964 return was filed on October 18, 1966. Petitioner testified that the reason he was unable to file his return on time was that he was very busy trying to reestablish his law practice and pursue his business interests after having been out of the state for some undisclosed period of time and that he was just unable to get all his records together in order to file a timely return. He further testified that he had an accountant assisting him in getting his records together, and that Polly Sellers took no part in his business affairs or in the preparation of their joint individual income tax returns. Petitioner also applied for and was granted 6-month extensions of time in which to file his 1965 and 1966 individual income tax returns. The reasons stated on the applications for extensions of time for all three years were basically that petitioner and his accountants needed the additional time in order to get all his records together. Despite his continued pleas for additional time in which to *389 collect his records, petitioner testified that he maintained a full and complete double-entry set of journals and ledgers accurately portraying his business transactions and including adequate supporting data. One of respondent's agents charged with investigating petitioner's tax liability testified, however, that no doubleentry system of books for 1964, 1965, or 1966 was ever made available to him. He further testified that in his opinion, even with an unlimited amount of time for examination, petitioner's records would support only about 75 percent of the transactions in which he was involved. Agent Fleischmann stated that a full and accurate examination of petitioner's affairs could not be completed without petitioner's presence to interpret various book entries because petitioner's "records did not always stand up by themselves in complete explanation of all transactions." Petitioner's records introduced into evidence in this proceeding support the testimony of Agent Fleischmann. OPINION As we alluded to earlier, in disposing of these cases, the Court is confronted with a record critically lacking in clarity. The parties' briefs have likewise proved to be of limited usefulness *390 in sorting out the pertinent facts. Consequently the burden of proof concept plays a significant role in our resolution of the issues presented. Because the petitioners' briefs display what we perceive to be a basic misconception of this concept, we think a brief comment on the burden of proof is in order. Petitioners acknowledge at the outset of their argument on brief that they bear the burden of proof in seeking to set aside the tax deficiencies determined by respondent. See Rule 142, Tax Court Rules of Practice and Procedure. Petitioners then state that "enunciations of the [respondent] * * * must be based on facts, reasonable inferences from facts, proper application of the law, and reasonable and proper calculations from the factual data." Subsequently, petitioners argue at various points that there is no evidence to support respondent's determinations and therefore they must prevail. Without disputing the underlying validity of the above quote, but even acknowledging its equal applicability to our role, the conclusion which petitioners urge does not necessarily follow on those issues on which they bear the burden of proof. As the Court of Appeals for the Fourth Circuit *391 explained in Foster v. Commissioner,391 F. 2d 727 (4 Cir., 1968), at 735: The burden of proof is on the Commissioner to show that the taxpayer received income. This burden is initially satisfied, however, by the fact that the Commissioner's deficiency determination is presumed correct. The burden is thus on the taxpayer to prove the incorrectness of the deficiency determination. This burden is procedural and is met if the taxpayer produces competent and relevant evidence from which it could be found that he did not receive the income alleged in the deficiency notice. In other words, the taxpayer at this point has the burden of producing evidence or of going forward with the evidence. If this burden is met, the burden of proof shifts back to the Commissioner to prove the existence and amount of the deficiency. [Footnotes omitted] Thus, when an issue on which the taxpayer bears the burden of proof comes to us for decision, the taxpayer is obligated to place on the record sufficient credible evidence for us to decide that the Commissioner's determination is erroneous. Otherwise, the presumption of correctness attached to the Commissioner's determinations suffices for evidence *392 and his determination must be sustained. The key phrase here is sufficientcredibleevidence, because uncorroborated conclusory testimony and unexplained documents are no evidence at all and therefore they cannot be used to satisfy the taxpayer's burden of producing evidence. Foster v. Commissioner,supra, at 735-736. The bottom line of this discussion is that the Court must decide the issues presented to it by the parties, and while we strive to do so "based on facts, reasonable inferences from facts, * * * and reasonable and proper calculations from the factual data," unless the necessary factual evidence is placed on the record, "proper application of the law" requires that the party obligated to produce the evidence must lose. Exchange State Bank v. Commissioner.8 T.C. 721, 726 (1947). A. Norpaco Builders, Inc., and Related Issues.
The facts relating to the first series of issues which we will consider are set forth largely under subsection A of our Findings of Fact. However, certain additional information is necessary to explain our disposition of these issues. In the notice of deficiencies issued to Norpaco, respondent determined that Norpaco realized unreported income *393 of $3,640.00 in 1965 from the sale of Oceanview and $3,600.00 in 1966 from the sale of Lot B of Fox Hall Manor. In the notice of deficiencies issued to Frank and Polly Sellers, respondent determined that they realized unreported income of $3,150.00 in 1965 from the sale of Lot A of Fox Hall Manor. On brief respondent asserts that the correct amount of gain from each of these sales is as follows: Petitioner
Year
Amount
Property
Norpaco
1965
$2,232.45
Oceanview
Norpaco
1966
3,650.00
Lot B
Sellers
1965
3,050.00
Lot A
The modified figures result from the parties' stipulation of certain prices different from those used in the notices of deficiencies and from respondent's concession of certain costs incurred in the sale of Oceanview. Before proceeding to the petitioners' theory of this portion of the case, we will outline the basis for respondent's modified figures of gain. On November 11, 1964, title to Fox Hall Manor was taken in the name of Sellers Realty Corporation. The purchase price of the property was $13,000.00. Lot B was subsequently transferred to Norpaco and it was valued at $3,450.00. Lot A was sold on January 19, 1965, for $12,600.00. The gain of $3,050.00 from the sale of Lot A was *394 computed by subtracting the basis in Lot A, $9,550.00 ($13,000.00-$3,450.00) from the sale price of $12,600.00. Respondent further determined that this gain constituted income to Frank Sellers because Sellers Realty was a sham, merely a straw entity holding naked legal title to the property for the benefit of petitioner. The gains realized from the sales of Lot B and Oceanview were computed in a similar manner. However, because no records of the costs of construction of the houses on those lots were made available, respondent determined "reasonable" costs of construction of $7,000.00 for the Lot B house and $12,960.00 for the Oceanview house. The gain of $3,650.00 from the sale of Lot B was computed by subtracting Norpaco's basis of $10,450.00 ($3,450.00 plus $7,000.00) from the sale price of $14,100.00. The $2,232.45 gain from the sale of Oceanview was computed by subtracting Norpaco's basis of $15,160.00 ($2,200.00 plus $12,960.00) plus its sales costs of $1,357.55 from the sale price of $18,750.00. Although petitioner and Norpaco argue in conclusory terms that no profit was derived from any of these sales, neither introduced any evidence of costs contrary to the figures used *395 by respondent in his calculations. Inasmuch as we cannot find the respondent's figures to be unreasonable, we accept his calculations of the amounts of gain as set forth above. The petitioners' primary position, however, is that their only connection with the foregoing transactions was as agents or nominees of Charles D. Norton. The record does reveal that petitioner and Norton had some type of business relationship, but we are unable to determine exactly what it was. Petitioner's version of the facts is somewhat as follows: In 1964 Norton was suffering financial embarrassment, owing money to numerous creditors. As Norton's attorney, petitioner determined to assist him to remain in the construction business. In furtherance of his aim, petitioner allowed Norton to purchase Fox Hall Manor in the name of Sellers Realty Corporation. He then chartered Norpaco in order to have a viable corporate entity. Nonetheless, Norpaco performed no business function, but merely existed as a titleholder to land owned by Norton. Petitioner served as president and stockholder of the corporation in order to deceive Norton's creditors. The three transactions involved herein are thus attributable *396 to Norton and not to petitioner or Norpaco. A number of factors combine to persuade us to reject petitioners' theory of the case. We have nothing before us to support Frank Sellers' confusing and conclusory testimony. The statement of Charles D. Norton, set out fully in the statement of facts, stops far short of providing any insight into these transactions. At best that statement reveals only that Norton was unaware of what transpired with regard to Norpaco. Of course, a taxpayer's records are relevant and competent evidence, but the weight to be accorded them is dependent upon their completeness and credibility. Richardson v. Commissioner,264 F. 2d 400, 403 (4 Cir., 1959); Estate of Falese v. Commissioner,58 T.C. 895, 898 (1972). Petitioner introduced into evidence a number of ledger sheets identified only as accounts which he maintained for Norton for 1964 and 1965. Several of the sheets do contain references to Norpaco and to the Fox Hall Manor and Oceanview properties. However, petitioner neglected to enlighten us as to what any of the specific entries meant, or even what the accounts were supposed to represent. Consequently the records are of no probative value. [8] *397 Moreover, petitioner kept himself in a position of apparent control over the subject properties. Sparse as it is, on all of the documentary evidence before us, petitioner appears as the interested party. He signed the deed conveying Lot B of Fox Hall Manor from Sellers Realty to Norpaco as the president of Sellers Realty. He signed Norpaco's 1965 income tax return as its president, and he was identified on the return as its 100 percent stockholder. Sellers Realty and Norpaco maintained no corporate books and records of their own, and what allegedly relevant records we have seen were maintained by petitioner. Petitioner's dominance in these transactions *398 is too great for us to overturn respondent's determinations simply on the basis of his sketchy testimony. Even making some allowance for the lack of documentary support on the basis that Norton should be charged with the responsibility for maintaining appropriate records, we are disturbed with the lack of explanation for the failure to call William A. Rhyne as a witness for petitioners. Although neither party has mentioned Rhyne in their briefs, his name appears as the secretary of four different corporations involving petitioner and Norton. Rhyne signed the deed conveying Lot B of Fox Hall Manor from Sellers Realty to Norpaco as the secretary of Sellers Realty. His name also appears as assistant secretary of Frank E. Sellers, Inc., of which petitioner was president, and of Norton Building Corporation and Norton Construction Co., Inc., of which Charles D. Norton was president, on a deed evidencing a mass conveyance of properties by those corporations to Norpaco and Sellers Enterprises. Of unmost interest in regard to Rhyne, however, are two entries, apparently representing checks which appear in the ledger sheets identified as Norton's accounts. On January 13, 1965, the following *399 entries appear: Wm. A. Rhyne
1312
282.65
Norpaco-FICA & W.H.
Rhyne
1313
42.35
Although Norton's demise prevented his testimony, we are not willing to presume that Rhyne's testimony would have supported the petitioner. Kamborian v. Commissioner,56 T.C. 847, 869 (1971), affd. 469 F. 2d 219 (1 Cir, 1972). "Indeed, the normal inference is that it would have been unfavorable." Pollack v. Commissioner,47 T.C. 92, 108 (1966), affd. 392 F. 2d 409 (5 Cir., 1968). The deed just referred to raises a number of additional questions as to the true nature of petitioner and Norton's relationship. The deed evidences a number of conveyances from the "Norton corporations" to Norpaco. It also includes a conveyance from Norton and his wife, individually, to Sellers Enterprises, a partnership about which more will be said later. We need not speculate about the significance of this transaction, however, but we merely point to it as one more confusing and unexplained facet of petitioner's various activities which cause us to look askance at his unsupported testimony as to his and Norpaco's business relationship with Norton. Our rejection of petitioner's characterization of himself as an agent or nominee *400 for Norton is the first step toward resolution of several issues. Ordinarily a corporate entity will not be ignored for Federal income tax purposes. However, as we stated in Strong v. Commissioner,66 T.C. 12, 24 (1976): affd. F.2d (2 Cir. Feb. 14, 1977)). In short, a corporate "straw" may be used to separate apparent from actual ownership of property, without incurring the tax consequences of an actual transfer; but to prevent evasion or abuse of the two-tiered tax structure, a taxpayer's claim that his controlled corporation should be disregarded will be closely scrutinized. If the corporation was intended to, or did in fact, act in its own name with respect to property, its ownership thereof will not be disregarded. The degree of corporate purpose and activity requiring recognition of the corporation as a separate entity is extremely low. Thus, it has been stated that "a determination whether a corporation is to be considered as doing business is not necessarily dependent upon the quantum of business" and that the business activity may be "minimal." See Britt v. United States,431 F. 2d 227, 235, 237 (5th Cir. 1970). In this case, respondent and petitioner have each in turn *401 urged nonrecognition of the corporate status of different entities. Respondent determined that Sellers Realty was but a straw entity, acting as nominee for Frank Sellers. At the time of its involvement in this case, Sellers Realty was a defunct corporation. Its charter had been revoked for nonpayment of franchise taxes. Although this alone is insufficient to require disregarding its corporate form, Hill v. Commissioner,66 T.C. 701, 705 (1976), the only evidence as to Sellers Realty's actions with regard to Fox Hall Manor is that it took, held, and conveyed title to the property. It had no separate bank account and maintained no records of its own. Petitioner contests respondent's determination only insofar as he alleges that Sellers Realty was the nominee for Norton rather than for himself. Under these circumstances we think the corporate structure of Sellers Realty is properly disregarded and the gain of $3,050.00 realized on the sale of Lot A is properly considered the income of Frank Sellers. Petitioner's argument that Norpaco was a mere nominee for Norton is likewise gutted by our rejection of his unsupported testimony. Nonetheless, a decision that Norpaco fits within *402 the "purely passive dummy" exception to the general rule of corporate recognition would affect the income tax liabilities at issue, i.e. there would be no corporate income, hence no corporate income tax owing and therefore no basis to assert transferee liability. Respondent's failure to respond to petitioner's argument, confusing as it was, has probably made the issue much closer than it need be. However, our independent examination of the record leads us to conclude that petitioner has not shown Norpaco to be a mere title holder to land. Initially, Norpaco's 1965 tax return reflects unexplained assets and liabilities not readily identifiable as related to its alleged status as a mere title holder. Norton's statement also referred to several houses being built in Norpaco's name on land purchased by the corporation. Moreover, there remains the unexplained payment to William A. Rhyne, apparently on behalf of Norpaco, which was mentioned earlier in this opinion. Inasmuch as only minimal activity is required for a corporation to earn its right to be taxed as such, Strong v. Commissioner,supra, these limited but unexplained references to activity by Norpaco are sufficient for us *403 to hold that Norpaco is properly taxable as a corporation. See Carver v. United States,412 F. 2d 233 (Ct. Cl., 1969), a case with a fact pattern similar to that presented here. We come next to the issue of whether petitioner received unreported dividend income from Norpaco in 1965 and 1966. Respondent's determinations of dividend income coincide in amount with the gains realized by Norpaco from the sales of Oceanview and Lot B of Fox Hall Manor, $2,232.45 and $3,650.00, in 1965 and 1966, respectively, and they stem from the fact that Norpaco utilized petitioner's bank account rather than one of its own. Respondent acknowledges that the lack of adequate records makes the course of Norpaco's financial transactions unable to be traced with certainty, but reasons that because the profits must have flowed into petitioner's bank account, as president and sole stockholder of Norpaco, petitioner had the funds in his possession and subject to his unfettered control. Petitioner's response to respondent's argument is simply his conclusory testimony that he acted as Norton's agent, that Norpaco never realized any profits, that he never received any money or property from Norpaco, and that *404 Norton received all the monies flowing from any of Norpaco's transactions. In light of what we have already decided, and in the absence of any supporting evidence, we cannot accept petitioner's factual claims. Petitioner's legal claims are likewise without merit. Even if, as petitioner asserts without citing any authority, Virginia law requires dividends to be paid from a corporation's earned surplus, the taxability of corporate distributions is to be determined according to Federal law. Lundeen v. Commissioner,33 T.C. 19, 25 (1959). Under section 316(a)(2), the term dividend includes any distribution of property made by a corporation to its shareholders out of its earnings and profits of the taxable year. Petitioner, on whom the burden of proof lies, having failed to present evidence to the contrary, it will be assumed that the funds under discussion were from the earnings and profits of Norpaco. What we have just said is equally applicable to petitioner's claim that the amount of the dividends should be reduced by the amount of taxes owing from Norpaco. Respondent determined that petitioner received the full amounts of $2,232.45 in 1965 and $3,650.00 in 1966, without regard *405 to reduction for taxes, and there is no evidence to the contrary. Cf. Schneider v. Commissioner,65 T.C. 18, 31 (1975). Finally, it is of no consequence that Norpaco failed to formally declare a dividend. Commissioner v. Makransky,321 F.2d 598, 601 (3 Cir., 1963). Before proceeding to the issue of petitioner's liability as transferee of Norpaco's assets, we will dispose of the issues raised by respondent's determinations that Norpaco is liable for the additions to taxes imposed by section 6651(a) and 6653(a) for both 1965 and 1966. Section 6651(a) provides for certain additions to tax in the event that a return is not made and filed within the prescribed time (determined with regard to any extension of time for filing), "unless it is shown that such failure [was] due to reasonable cause and not due to willful neglect." Thus, in order to avoid liability for the 20 and 25 percent additions to tax asserted by respondent for 1965 and 1966, respectively, Norpaco bears the burden of showing that the delinquent filing of its 1965 return and its failure to file a return for 1966 were due to reasonable cause. Daron Industries. Inc. v. Commissioner,62 T.C. 847, 860-861 (1974). Section *406 301.6651-1(c), Proced. & Admin. Reg., provides in part that "If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to a reasonable cause." The argument presented on brief in support of establishing reasonable cause consists of the following sentence: "Since Norpaco Builders, Inc. had no income for either 1965 or 1966, there was no bad faith in not filing or filing late." Aside from the fact that bad faith is not the applicable standard for determining liability, this rationale is contrary to our interpretation of the pertinent facts and thus fails to indicate reasonable cause. It should be noted in this regard that Norpaco's 1965 return, signed by Frank Sellers as president and reporting "No Operations," was filed three months and one day late elen after receiving a three-month extension of time in which to file. It is difficult to imagine that with the exercise of ordinary business care and prudence a corporation allegedly having no operations would need over eight months in which to so state. During his trial testimony petitioner also made some illusory references to a firm *407 of certified public accountants allegedly engaged to prepare Norpaco's income tax returns. To the extent that a taxpayer's justified reliance upon his accountant to file his returns may constitute reasonable cause to avoid section 6651(a) liability, see West Coast Ice Co. v. Commissioner,49 T.C. 345, 351 (1968), suffice it to say that the record herein is utterly silent as to any facts which would establish such justified reliance with regard to Norpaco's 1965 and 1966 returns. Inter-American Life Insurance Co. v. Commissioner,56 T.C. 497, 511 (1971); Daron Industries. Inc. v. Commissioner,supra.Imposition of the section 6651(a) additions to tax are sustained. We likewise sustain respondent's assertion of the five percent additions to tax imposed by section 6653(a). That section provides for an addition to tax if any part of any underpayment is due to negligence or intentional disregard of respondent's rules and regulations. The underpayment in this case is the amount of tax imposed. Section 301.6653-1(c)(1)(ii), Proced. & Admin. Regs. Norpaco's president, Frank Sellers, was an attorney and a real estate broker in his own right. Nevertheless, Norpaco failed to maintain *408 its own checking account or any books and records relative to its transactions. Petitioner's assertion that "The fact that Norpaco Builders, Inc., had no books and records is inmaterial [sic] since the uncontradicted evidence is that they had no transactions to record" is again contrary to our view of the record. And again, too, the record fails to reveal any evidence that would insulate Norpaco from the 6653(a) additions to tax because of reliance upon any accountants. See Pritchett v. Commissioner,63 T.C. 149, 173-175 (1974). The burden being upon the taxpayer to show that the additions to tax were improperly asserted, Smith v. Commissioner,66 T.C. 622, 651 (1976), we conclude that the five percent additions to tax were properly imposed upon Norpaco for 1965 and 1966. The last issue which we must decide in this segment of the cases is whether Frank E. Sellers is liable, as a transferee of property from Norpaco, for any part of the corporation's income tax deficiencies and additions to tax. Section 6901(a) (1)(A)(i) authorizes this procedure for assessing and collecting the liability of a transferee. The existence and extent of the substantive liability, however, either at law *409 or in equity, is to be determined in accordance with state law. See Commissioner v. Stern,357 U.S. 39, 45 (1958); Bellin v. Commissioner,65 T.C. 676, 679 et seq (1975). Section 6902(a) imposes the burden of proving petitioner's liability as a transferee upon respondent. Rule 142(d), Tax Court Rules of Practice and Procedure.
Respondent relies principally upon section 55-80, [9] *411 Code of Virginia, for the definition of his rights. Never addressing the applicability of the statute specifically, petitioner argues only that there is no showing that he ever received any assets from Norpaco or otherwise deprived the corporation of the means to pay "lawfully assessed taxes." We reject petitioner's contention that he is not a transferee. Although the evidence of Norpaco's activities is scanty, and respondent bears the burden of proof on this issue, we think the facts of record and reasonable inferences therefrom are sufficient for us to find that Norpaco's profits found their way into petitioner's possession through his bank account. Respondent's initial burden having been satisfied, the burden to present countervailing evidence shifted to petitioner, Owens v. Commissioner,64 T.C. 1, 16 (1975), *410 and he has utterly failed to respond. Although petitioner constantly referred to the bank account used by Norpaco as his "attorney" account, he has introduced no bank statements or checks or other records of any kind that would lend support to his testimony. He also offered no explanation of the significance of reference to the bank account as an "attorney" account. We conclude, therefore, that petitioner is a transferee of Norpaco's profits of $2,232.45 in 1965 and $3,650.00 in 1966.
The applicability of Virginia law to this factual situation remains to be resolved, however. Under section 55-80 of the Virginia Code, a transfer is voidable if made with the intent to delay, hinder, or defraud either existing or subsequent creditors, see Colonial Inv. Co. v. CherrydaleCement Block Co., 73 S.E. 2d 419 (Va. 1952), or other persons, see Crowder v. Crowder,99 S.E. 746 (Va. 1919), from what they are or may be lawfully entitled to. Intent to hinder or delay is sufficient to activate the provision, there being no requirement of proof of intent absolutely to defraud. Darden v. George G. Lee Co.,129 S.E. 2d 897 (Va. 1963). Though considerably lengthier in toto, the essence of respondent's argument is "the fact that Frank Sellers, an attprney, deliberately kept inadequate corporate and personal records, that he used his own checking account for corporate business, and routinely shifted property from one entity to another, shows that he was either totally irrational and grossly negligent, or he intended to hinder, delay, and maybe even defraud his creditors, among whom was the Internal Revenue Service. " Although respondent's argument appears *412 to be directed toward petitioner's intent as an individual, as gleaned from his general methods of doing business, and we reach the same ultimate result, we think the pertinent inquiry must be directed toward petitioner's intent while wearing the hat of president of Norpaco. It is the intent with which Norpaco's funds were transferred from it, i.e., whether the intent was to hinder or delay persons having a claim to Norpaco's funds, that governs the validity of the transfers. The obvious and inevitable effect of conducting Norpaco's financial affairs through petitioner's bank account, rather than one of its own, was to hinder and delay third parties having a claim to any corporate funds. Their very existence does not even readily appear in a search for corporate assets. Inasmuch as every profitable transaction gives rise to potential income tax liability, especially in the absence of any evidence to the contrary, we think the appropriate conclusion here is that Norpaco's transactions were conducted with the intent to hinder and delay those persons having a claim to its assets.Although we have rejected petitioner's argument that he served as an agent for C. D. Norton, we think it *413 significant that the stated reason for his alleged agency status was to hinder and delay Norton's creditors. Under these circumstances, we hold that petitioner is liable as a transferee for the income tax deficiencies and additions to tax heretofore determined to be owing from Norpaco for 1965 and 1966. Estate of E. Brooks Glass, Jr. v. Commissioner, 55 T.C. 543, 576 (1970), aff'd per curiam 453 F. 2d 1375 (5 Cir., 1972). Petitioner is also liable for Norpaco's taxes by operation of section 55-81 of the Virginia Code. [10] *414 In an indistinguishable factual situation, applying a West Virginia statute identical in all material respects to the Virginia statute, the Court of Appeals for the Fourth Circuit found transferee liability because as a stockholder, the transferee's "right to any corporate income was subject to the corporation's liabilities, including the government's claim for taxes due on the income." C.D. Construction Corp. v. Commissioner,451 F. 2d 470, 472 (4 Cir., 1971), certiorari denied 405 U.S. 988 (1972). Inasmuch as petitioner testified at trial that Norpaco was without assets, we think his allegations of procedural errors regarding respondent's failure to proceed first against the corporation are without merit. See Commissioner v. Kuckenberg,309 F. 2d 202, 206 (C.A. 9, 1962), certiorari denied 373 U.S. 909 (1963). B. Sellers Enterprises. Subchapter K, Internal Revenue Code of 1954, establishes the basic framework for taxation of income derived from business conducted in partnership form. A partnership as such is not subject to the income tax, but rather the persons carrying on business as partners must account for its tax consequences in their separate or individual *415 capacities. Section 701. In determining his individual income tax each partner is required to take into account separately his distributive share of the partnership's taxable income or loss. Section 702(a)(9). Section 704(a) provides the general rule that a partner's distributive share of income, gain, loss, deduction, or credit is to be determined by the partnership agreement. Thus, Subchapter K permits partners, by their partnership agreement, to arrange their tax affairs intersese to a certain extent. Foxman v. Commissioner, 41 T.C. 535, 551 (1964), affd. 352 F. 2d 466 (3.Cir., 1965). However, as to any matter on which the partnership agreement is silent, the provisions of local law are considered to constitute a part of the agreement. Section 1.761-1(c), Income Tax Regs.
The parties have stipulated that in 1964 Frank, John, and Florence Sellers formed a limited partnership in the name of Sellers Enterprises and that the partnership incurred losses of $18,163.76, $34,154.80, and $34,397.85 in 1964, 1965, and 1966, respectively. Petitioner claimed none of the losses on his individual returns for those years. The issue to be decided here is what is petitioner's distributive *416 share of the losses incurred by Sellers Enterprises for 1964 through 1966. In the statutory notice of deficiencies issued to Frank and Polly Sellers, respondent determined that petitioner was entitled to deductions of $13,661.92 and $13,759.14 for 1965 and 1966, respectively, explaining "You have been allowed to claim 40% of the losses incurred by the partnership of Sellers Enterprises whereas you did not claim any of such loss." In his petition to this Court, petitioner asserted that the partnership loss for 1964 had been erroneously ignored in the notice of deficiencies, and respondent has conceded (or now agrees) that the losses should be consistently treated for all three years involved. Respondent maintains on brief, however, that petitioner is entitled to deduct "approximately 80% of the loss of Sellers Enterprises." Respondent bases his argument regarding petitioner's distributive share of the partnership losses on article IX(a) of the certificate of limited partnership. Article IX(a), heretofore set out verbatim, provides that each limited partner's share of profits shall bear the same proportion to the net income of the partnership as his initial and additional contributions *417 relate to the total initial and additional contributions, adjusted to account for the timing of the contributions and the period when income is earned. Respondent reasons that if a general partner also makes contributions to the partnership, the entire income could never be allocated to the limited partners, and therefore by implication the provision must be interpreted to mean that all partners share profits in proportion to their capital contributions. Citing section 50-18(a), Code of Virginia, for the proposition that a partner must contribute toward losses according to his share of the profits, respondent concludes that each partner's distributive share of the partnership losses is likewise determined by the ratio that his contributions bear to the total capital contributed to the partnership. [11]
Petitioner maintains, on the other hand, that respondent has inaccurately considered the certificate of limited partnership to be the partnership agreement. *418 He contends that the certificate was merely drafted in order to comply with Virginia law, [12] and that the actual partnership agreement as to sharing of profits and losses was oral. Pursuant to the oral agreement, the partnership "was set up to provide 100% of the gain and/or loss to the limited partners" and petitioner, as the general partner, was merely to receive a fee each year as compensation for his services. Petitioner points to his individual tax returns (on which he claimed none of the losses), the partnership informational returns, Forms 1065 (on which the entire loss each year is attributed to John Sellers), and the partners' capital account ledger sheets (on which each year's loss is applied to reduce John Sellers' net capital contribution) as evidence of the existence and substance of the oral agreement. [13]
The documents to which petitioner directs our attention establish beyond serious question that the partners agreed that John Sellers would claim the taxable losses of the partnership *419 for 1964 through 1966 on his individual returns. However, it is the basis on which partners agree to share the economic profits and bear the economic losses of the partnership that determines their distributive shares of taxable income and loss, not the basis on which they might agree to report income or claim losses on their individual returns. Kresser v. Commissioner,54 T.C. 1621, 1631 (1970). See Dorman v. United States,296 F. 2d 27, 32 (9 Cir., 1961); Mayer v. United States,26 F. Supp 815 (Ct. Cl., 1939); Hood v. Commissioner,19 B.T.A. 962, 966 (1930); Parish v. v. Commissioner, 9 B.T.A. 1236, 1240 (1928). Although Subchapter K authorizes a certain flexibility within which partners may arrange their tax affairs intersese, it does not give them carte blanche to ignore economic reality. [14] *420 *421 Kresser v. Commissioner,supra, involved a purported allocation of the entire income of two partnerships to a single partner for a particular year. The Commissioner determined that the other partners were taxable on their distributive shares of the partnership income without respect to the alleged modification of the profit-sharing agreement, and his determinations were upheld. The evidence suggested that there was no bona fide reallocation of partnership income, but rather the partner to whom the income was allegedly allocated undertook an obligation to restore to the other partners their distributive share of such income in future years. The method by which this result was to be accomplished is not important here. The significant point is that the partnership agreement as to the sharing of profits and losses must be real in order for it to be given tax effect. As a general partner in Sellers Enterprises, petitioner is personally liable for all recourse debts and obligations of the partnership. Sections 50-15, 50-52, Code of Virginia. As a limited partner, however, John Sellers is liable only to the extent *422 of his investment in the partnership and Florence Sellers is liable only to the extent of $100 or any larger contribution that she might make to the partnership. Section 50-60, Code of Virginia.To find any economic reality to petitioner's alleged oral partnership agreement, we would, therefore, have to find that the limited partners therein became obligated to bear the economic burden of the partnership liabilities otherwise to be borne by the general partner in the event that its assets were disposed of at a net loss. Cf. Orrisch v. Commissioner.55 T.C. 395, 403 (1970), affirmed per curiam C.A. 9. The evidence of record fails to establish any such affirmative undertaking by the limited partners, however. Article XIII(c) of the certificate of limited partnership states that in the event of dissolution at petitioner's death, his estate is to make suitable provision for partnership liabilities. Petitioner testified that the alleged oral agreement contemplated that the limited partners would "have all the burdens and benefits" of the partnership, but he nowhere contends that by the agreement he was relieved of liability for partnership debts. We are not convinced that petitioner's *423 loose and vague testimony was even directed to this crucial point, but in any event it provides no basis for us to determine the specific legal obligations of the partners, especially where as here the result which petitioner desires us to reach runs directly contrary to the usual purpose for one becoming a limited partner in a partnership, i.e. in order to avoid obligation for partnership debts in excess of his actual or stated contributions. Although of no import to our decision, the record suggests that Sellers Enterprises was availed of to provide a tax shelter for John Sellers' income from his medical practice. The real estate venture was of a type generally expected to produce taxable losses in its first few years of operation, as it in fact did. Moreover, petitioner admitted the tax avoidance goal by his testimony that rather than sell several rental dwellings which he owned and which were themselves producing tax losses, he decided to transfer them to the partnership for the benefit of his brother. [15] On whether the partners could have reached an agreement that would have given then their desired result, we express no opinion. However, petitioner's failure to produce either *424 of the limited partners as a witness in this proceeding and his failure to present a clear picture of any oral partnership agreement as to sharing of profits and losses leaves us with a definite impression that this venture was embarked upon without any more definitive declaration of the partners' obligations than those imposed by law. It appears that the partners focused their attention on the tax benefits to be derived from Sellers Enterprises and never considered the substantive requirements necessary to give them their desired result. Failure to provide in the partnership agreement for the sharing of partnership losses requires us therefore to look to Virginia law to determine the partners' distributive shares of Sellers Enterprises' losses. Section 1.761-1(c), Income Tax Regs. Pursuant to section 50-18(a), Code of Virginia, in the absence of a contrary agreement, each partner must contribute toward losses according to his share of the profits, except that a limited partner is liable only to the extent so stated in *425 the certificate of limited partnership, section 50-60, Code of Virginia. We think respondent's interpretation of Article IX(a) of the certificate of limited partnership is correct, and it is controlling as to the method for division of profits, i.e. on the basis of capital contributions, notwithstanding petitioner's illusory testimony that the terms of the certificate were designed merely to comply with Virginia law and that the limited partners were to have all the 'benefits' of the partnership. Petitioner's failure to create a coherent record consisting of credible evidence on which to base his arguments is not a factor that operates in his favor on this issue. We hold, therefore, that petitioner's distributive share of the losses incurred by Sellers Enterprises for each year is to be determined on the basis of the partners' respective capital contributions, the exact amounts of which may be computed under Rule 155. C. Miscellaneous Issues re Frank and Polly Sellers.
As to each of the remaining issues, we find that petitioner has failed to meet his burden of establishing that respondent's determinations are incorrect. 1. Net Operating Loss Deductions.Petitioner claimed a net *426 operating loss deduction on his returns for each of the years 1964 through 1966, based on net operating loss carryovers from 1962 and 1963. In determining the deficiencies at issue herein, respondent disallowed each of the deductions in toto. The burden of establishing entitlement to the deductions, including the amounts, falls upon the petitioner. Kasey v. Commissioner,54 T.C. 1642, 1650 (1970); Jones v. Commissioner,25 T.C. 1100, 1104 (1956). In support of the deductions, petitioner introduced into evidence his individual returns for 1960 through 1963, a combination journal and ledger for the years 1962 and 1963, and a schedule attached to his returns for each year showing the use and preservation of the total loss carryovers. He then testified that the returns for each year were accurately prepared and that the deductions claimed were all supported by his books and records. He further testified, as best we can tell, about a loss he had claimed in 1959 that was subsequently disallowed by respondent. In opposition to the deductions, petitioner introduced into evidence a copy of the Internal Revenue Service's findings as a result of an audit of his individual returns for 1959 *427 through 1963. Those findings indicate that petitioner's net operating losses were fully absorbed prior to 1964, and a deficiency was asserted for 1963 based on taxable income of $1,734.46. Petitioner did not appeal these findings, although his position in this proceeding would require us to find them erroneous in many material respects. Petitioner has made no attempt to explain the records which he introduced into evidence, and they remain incomprehensible to us. His naked testimony that his returns were accurate as filed does not even begin to prove his entitlement to the deductions. Halle v. Commissioner,7 T.C. 245, 247 (1946), affd. 175 F. 2d 500 (2 Cir., 1949), certiorari denied 338 U.S. 949 (1950). Under these circumstances we must sustain respondent's disallowance of the net operating loss deductions for each of the years before us. Jones v. Commissioner,supra.
2. Business Bad Debt Deductions. On his 1965 return petitioner claimed a deduction of $4,727.41 for bad debt expense and a deduction of $4,498.65 for "unreimbursed expenses advanced." Respondent disallowed all but $852.75 of the deductions. Petitioner testified that both items represented sums which he disbursed *428 to or expended on behalf of clients in his law practice. Therefore, we will treat both amounts as attempted business bad debt deductions. Section 166(a)(1) as limited by section 166(d)(1)(A), allows a deduction to individual taxpayers for any business debts which become "worthless within the taxable year." The petitioner has the burden of proving his entitlement to the deductions. In order to do so he must establish both the existence of a valid debtor-creditor relationship, Wilson v. Commissioner,40 T.C. 543, 550 (1963), and that the debts became worthless within the taxable year. In order to satisfy this latter requirement, he must show that the debts had some value at the beginning of 1965 and that they had no value at the end of that year. Dustin v. Commissioner,53 T.C. 491, 501 (1969), affd. 467 F. 2d 47 (C.A. 9, 1972). Mere non-payment of a debt does not establish its worthlessness, and failure to take reasonable steps to enforce collection, regardless of motive, does not justify a bad debt deduction. Perry v. Commissioner,22 T.C. 968, 974 (1954). The only evidence of the specific debts for which petitioner attempts to claim a deduction is a schedule of names, beside *429 each of which appears an amount and a date. Some of the names appear to be lawsuits in which petitioner was a party. The amounts range in size from $0.25 to over $2,000. The dates vary from 1955 to 1961. Petitioner testified specifically with regard to only four of the entries and stated that they were typical of the other items. His testimony fails to establish entitlement to any deductions in excess of the amount allowed by respondent. Even if we could find each item to be a valid debt, which we cannot, we could not find that any of them became worthless in 1965. Petitioner stated in general terms that he claimed a deduction in 1965 because that is when he decided to do so "as a matter of business judgment." His testimony falls far short of providing the evidence necessary to justify a bad debt deduction for 1965. Fox v. Commissioner,50 T.C. 813, 822 (1968), affirmed per curiam (9 Cir., March 9, 1970); Hearn v. Commissioner,36 T.C. 672 (1961), affd. 309 F. 2d 431 (9 Cir., 1962), certiorari denied 373 U.S. 909 (1963).See also Burnett v. Commissioner,42 T.C. 9 (1964), affd. and remanded 356 F. 2d 755 (5 Cir., 1966), certiorari denied 385 U.S. 832 (1966), wherein we held *430 similar expenditures made by a lawyer to or on behalf of his clients not to be ordinary and necessary business expenses under section 162.
3. Additions to tax.
Respondent determined that Frank and Polly Sellers are liable for the addition to tax imposed by section 6651(a) for 1964 and for the addition to tax imposed by section 6653(a) for 1964 through 1966. The law relative to both of these sections has been set out earlier in this opinion. The evidence justifies the imposition of all the additions to tax. In each of the three years before the Court, petitioner applied for and was granted six-month extensions of time in which to file his individual returns. The reason generally stated on each application was that additional time was needed in order for petitioner and his accountants to get his records together. Petitioner's 1964 return was filed on October 18, 1966, at the same time his 1965 return was filed, and over a year late. We can find no reasonable cause for petitioner's failure to timely file his 1964 return and therefore sustain respondent's assertion of the 25 percent addition to tax pursuant to section 6651(a).
Petitioner fares no better with regard to the five percent *431 section 6653(a) additions to tax. Despite the various applications for extensions of time in which to file his returns, on which the stated reason was in order to get his records together, petitioner maintains on brief that he "maintained a full and complete double entry set of books under the auspices of a reputable and well-known Certified Public Accountant who prepared the returns." However, he has never produced these records either for our benefit or for the benefit of the Internal Revenue Service. The records introduced into evidence for 1962 and 1963 are undecipherable. It appears that petitioner has rather extensive knowledge of but little or no regard for legal requirements. His gross negligence and intentional disregard for legal rules pervades his conduct displayed on the record herein. His conclusory testimony does not suffice for evidence, especially where he indicates that his books and records support his actions but no such supporting evidence is forthcoming. Imposition of the 6653(a) additions to tax are sustained. Only one other matter merits discussion. Petitioner argues on brief that Polly Sellers could not be negligent because she had nothing to do with *432 his business activities or the preparation of their joint tax returns. Presumably this statement is intended to constitute an argument that Polly Sellers is not liable for the additions to tax. However, when a joint return is made, the liability with respect to the tax is joint and several. Section 6013(d)(3); Hedrick v. Commissioner,63 T.C. 395, 403-404 (1974). The reference to "tax" includes additions to tax. Section 6659(a)(2). When Congress has intended to relieve an innocent spouse from joint liability regarding jointly reported income, it has done so specifically. See, e.g., section 6653(b). We have been shown no such provision that would avoid joint and several liability here. Bianchi v. Commissioner,66 T.C. 324, 335 (1976).
In order to reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. Unless otherwise indicated all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. This issue has been removed from our consideration by the petitioners' express withdrawal on brief of their reliance on limitations to bar the assessment and collection of any income tax deficiencies for 1965 or 1966. ↩
3. Inasmuch as petitioners have failed to pursue their claims for unreimbursed expenses in 1966 and additional oil and gas expenses in 1965 either by evidence at trial or by argument on brief, we deem these issues to have been abandoned. Rule 149(b), Tax Court Rules of Practice and Procedure.↩ In any event they have failed to prove their entitlement to such deductions.
4. We perceive petitioner's statement to be a reference to the fact that a partnership's nonrecourse debts may increase the basis of both general and limited partners in a partnership. See sec. 1.752-1(e), Income Tax Regs.↩
5. Sec. 50-45, Code of Virginia, requires limited partnerships to file for record a certificate, giving information set out in that section, with an appropriate county or city clerk's office.↩
6. Other than amount, these entries remain unexplained on the record. Most of the specific entries on petitioner's capital account ledger sheet also remain unexplained, despite identifying notations appearing beside some of them.↩
7. We use the word "purportedly" here because the sum of the items listed in petitioner's trial exhibit totalled $9,829.90, while the total deduction claimed for 1965 was only $9,226.06.↩
8. Petitioner states on brief that the records show that monies went from him into the affairs of Norton and Norpaco rather than the reverse. Of course this statement is not evidence, Rule 143(b), Tax Court Rules of Practice and Procedure↩, but even if we were able to draw that same conclusion from our own examination of the ledger sheets, when considered in conjunction with the following textual discussion above, it would not strengthen petitioner's argument that he acted only as Norton's agent or nominee in the subject transactions.
9. Va. Code Ann. sec. 55-80 (1974), enacted in 1919, provides: Every gift, conveyance, assignment or transfer of, or charge upon, any estate, real or personal, every suit commenced or decree, judgment or execution suffered or obtained and every bond or other writing given with intent to delay, hinder or defraud creditors, purchasers or other persons of or from what they are or may be lawfully entitled to shall, as to such creditors, purchasers or other persons, their representatives or assigns, be void. This section shall not affect the title of a purchaser for valuable consideration, unless it appear that he had notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor.
10. Va. Code Ann. sec. 55-81 (1974), enacted in 1919, provides: Every gift, conveyance, assignment, transfer or charge which is not upon consideration deemed valuable in law, or which is upon consideration of marriage, shall be void as to creditors whose debts shall have been contracted at the time it was made, but shall not, on that account merely, be void as to creditors whose debts shall have been contracted or as to purchasers who shall have purchased after it was made; and though it be decreed to be void as to a prior creditor, because voluntary or upon consideration of marriage, it shall not, for that cause, be decreed to be void as to subsequent creditors or purchasers.
11. Sec. 1.761-1(c), Income Tax Regs., provides in part: As to any matter on which the partnership agreement, or any modification thereof, is silent, the provisions of local law shall be considered to constitute a part of the agreement.↩
12. See note 5, supra↩.
13. Petitioner's further reliance on the books and records of the partnership is to no avail, however, because they were not introduced into evidence in this proceeding.↩
14. We are mindful that the law itself provides for some distortion of economic reality in this area stemming from the Supreme Court's decision in Crane v. Commissioner,331 U.S. 1 (1947). Section 1.752-1(e), Income Tax Regs., provides in part that "where none of the partners have any personal liability with respect to a partnership liability (as in the case of a mortgage on real estate acquired by the partnership without the assumption by the partnership or any of the partners of any liability on the mortgage), then all partners, including limited partners, shall be considered as sharing such liability under section 752(c) in the same proportion as they share the profits." Thus, a limited partner's basis against which to claim partnership losses, see section 704(d), is increased by nonrecourse debts without a corresponding increase in his capital at risk. Nonrecourse financing therefore provides an opportunity for partners, both general and limited, to claim losses not economically borne by any of them individually. See McKee, "Partnership Allocations in Real Estate Ventures: Crane, Kesser, and Orrisch," 30 Tax Law Review 1 (1974), and Dailey & Gaffney, Anatomy of a Real Estate Tax Shelter: The Tax Reform Scalpel, 55 Taxes 127 (Feb. 1977). Although the record herein suggests that a portion of Sellers Enterprises' liabilities were such nonrecourse debts, our decision should not be read to express an opinion as to the legally permissible agreements that partners may reach as to the sharing of partnership losses available only because of the Crane doctrine. Our holding goes to the lack of any substantive agreement regarding the sharing of losses.
15. This is not the only occasion on which petitioner has attempted to assist John Sellers shield his income from taxation. See John G. Sellers,T.C. Memo 1963-263↩.