JOHN L. HARRELL, JR., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Harrell v. Commissioner
Docket No. 3235-76.
United States Tax Court
T.C. Memo 1978-211; 1978 Tax Ct. Memo LEXIS 297; 37 T.C.M. (CCH) 911; T.C.M. (RIA) 780211; June 8, 1978, Filed Ray K. Babb, Jr., for the petitioner. *299 Thomas J. Miller, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined the following deficiencies in petitioner's Federal income taxes: Taxable Year
Deficiency
1968
$1,855.00
1969
2,190.00
1970
236.62
1971
1,413.00
The sole issue for decision is whether in 1971 petitioner sustained a loss which he is entitled to carry back to 1968, 1969 and 1970 under section 172. [1]
FINDINGS OF FACT Some of the facts have been stipulated by the parties and are found accordingly. Petitioner resided in Del City, Oklahoma, at the time he filed his petition herein. Prior to 1971 petitioner was a management analyst employed at Tinker Air Force Base. In November 1970 he suffered a heart attack and was unable to work until January 1971. Thereafter he resumed work on a part-time basis until June 1971, at which time he was placed on medical retirement. Because of his impending retirement, petitioner began to search for a new business opportunity. In April 1971 petitioner met Jim Evans and Carol *300 Nix. Mr. Evans and Ms. Nix operated a motorcycle shop in Shawnee, Oklahoma. The shop was undergoing financial difficulties at the time and was in danger of losing its distributorship with BSA, a major motorcycle producer. After meeting with Mr. Evans and Ms. Nix, petitioner agreed to purchase Ms. Nix's interest in the assets of the business for $4,000 and to enter into a partnership with Mr. Evans. The proposed agreement contemplated that petitioner and Evans would each make capital contributions of $6,000 to the partnership (in addition to the original inventory) and that petitioner would be responsible for motorcycle sales while Evans would be responsible for motorcycle repairs. On April 23, 1971, petitioner and Evans executed a document entitled "Articles of General Partnership." The agreement provided, inter alia, that the name of the partnership was Evans-Harrell Shawnee Motorcycles, that the partners' capital accounts were $6,000 each, that net profits and losses were to be divided equally between Evans and Harrell, that each partner was allowed a drawing account against earnings, and that either partner could dissolve the partnership at any time by serving a written notice *301 to the other partner. Following execution of the agreement, petitioner paid Ms. Nix $3,000 of the agreed price. However, petitioner never paid the $1,000 balance he owed her because of the existence of shortages in the business' inventory. Petitioner also made a capital contribution of $5,000 to the partnership. In order to meet partnership expenses, petitioner thereafter made numerous advances to the partnership, totaling $25,078.31 by the latter part of June 1971. Evans, however, never made the initial capital contribution to the partnership called for by his agreement with petitioner, or paid anything into the partnership. Sometime in June or July, 1971, petitioner decided to sever his relationship with Evans and to open a motorcycle shop of his own in Stillwater, Oklahoma. The decision was prompted in part by Evans' inability to obtain the money necessary for his capital contribution to the partnership. In furtherance of this plan, petitioner filed "Articles of Incorporation" with the Secretary of State of Oklahoma and received a "Certification of Incorporation" for J and J Cycles in the latter part of July 1971. In August 1971 petitioner suffered another heart attack *302 and entered a hospital; he remained in the hospital until mid-September of that year. Upon leaving the hospital petitioner devoted much of his time to his Stillwater operation. He also contacted Evans regarding Evans' failure to comply with an oral agreement between them that various motorcycles at the Shawnee shop would be transferred to petitioner's Stillwater shop. During late September and early October petitioner made additional advances to the Shawnee shop in the amount of $700. Thereafter, petitioner learned that the Shawnee shop was again in danger of losing its BSA distributorship. Several motorcycles, which BSA had financed under a floor plan arrangement, had been sold without compliance with the terms of that arrangement. Soon afterwards petitioner learned that BSA had repossessed all remaining BSA motorcycles in the Shawnee shop. [2] Upon becoming aware of this situation, petitioner went to Shawnee and temporarily closed the shop. Evans subsequently reopened the shop and in telephone conversations with petitioner agreed to pay petitioner for the latter's interest in the shop's assets. *303 In November petitioner, who had not received any payment for his interest in the shop's assets, contacted an attorney to help resolve the situation. On December 27, 1971, petitioner wrote a letter to Evans advising the latter that he proposed to wind up the partnership.He demanded that Evans turn over to him all of the shop's assets for the purpose of liquidating the inventory so that outstanding debts could be paid. In addition, petitioner demanded a complete accounting for the monies with-drawn from the business during the period of its existence. On January 3, 1972, petitioner filed a petition in the District Court of Pottawatomie County, Oklahoma, against Evans and another individual [3] seeking "an accounting to determine the exact loss to be shared by each of the partners" and "authority to liquidate the remaining assets of the partnership." The petition was apparently granted, and petitioner took control of the Shawnee shop for approximately one week in January, 1972, during which time he attempted to close down the operation. By the end of 1971, the partnership had incurred losses at least equal to petitioner's total 1971 cash investment, and the value of petitioner's *304 interest therein was negative. Thereafter, on April 8, 1972, petitioner and Evans entered into an agreement under which petitioner transferred to Evans all of his interest in Evans-Harrell Shawnee Motorcycles. In the agreement, both parties acknowledged that on or about April 23, 1971, they had entered into a general partnership by the name of Evans-Harrell Shawnee Motorcycles. Under the terms of the agreement, Evans agreed to transfer to petitioner his interest in J and J Cycles [4] and to pay petitioner $2,500 at the rate of $60 per month. Evans never paid any portion of this. Without petitioner's knowledge or consent, Evans caused to be prepared, signed and filed a Federal partnership return for Shawnee Motorcycle Sales and Service for the calendar year 1971. This return showed partnership net income for the year of $788.23. It showed an opening inventory of $3,500 and a closing inventory of $3,500. *305 Schedule M of the return showed the following: Beginning Capital
Income
Withdrawals &
Ending Capital
Account
Expenditures
Account
Evans
$3,921.69
$394.12
$2,944.89
$1,370.93
Harrell
3,921.69
394.12
440.00
3,875.80
$5,246.73 This partnership return was audited by respondent, who determined on audit that the partnership had had no income but a loss, of which petitioner's distributive share was $1,289.24. No adjustment was made in the inventory figure. On December 31, 1971, the partnership inventory was not in excess of $3,500. The partnership return showed assets of $15,096.73, liabilities of $9,850, and capital of $5,246.73. The "assets" included $7,671 for a dealer's license which in fact had no value in view of the failure of the business. The "assets" also included $3,500 of inventory. The partnership was in fact insolvent on December 31, 1971. Its liabilities then substantially exceeded its assets. Petitioner's distributive share of partnership losses for 1971 exceeded his total cash investment in the partnership during that year of $33,717. On his 1971 income tax return petitioner claimed a deduction of *306 $33,717 for business losses arising from his involvement with Evans-Harrell Shawnee Motorcycles. The loss was designated as a loss from the operation of a sole proprietorship. Petitioner also filed a Form 1045 ("Application for Tentative Refund From Carryback of Net Operating Loss") in order to carry back the claimed net operating loss from 1971 to 1968, 1969 and 1970 as follows: 1968
$10,900
1969
11,936
1970
856
$23,692
In the statutory notice, respondent disallowed the claimed deduction in its entirety for failure to substantiate the loss and determined that the motorcycle operation was a partnership and that petitioner's distributive share of partnership loss for 1971 was $1,289.24. OPINION The sole issue for decision is whether in 1971 petitioner incurred certain losses. If he did so, it is undisputed that he is entitled to carry them back to 1968, 1969 and 1970. In April 1971 petitioner, who was facing the prospect of a medical retirement from his civil service position, became involved with a motorcycle shop in Shawnee, Oklahoma. He purchased a partial interest in the assets of the business for $3,000 and entered into a partnership agreement *307 with Evans. In accordance with this agreement, he subsequently made a capital contribution of $5,000 to the partnership, and over the next few months of 1971 he made advances to the business totaling $25,778.31. The business had failed by January 3, 1972, when petitioner filed a court petition requesting liquidation of the business. Petitioner not only lost all that he had put into it, but had to respond to a judgment against him for partnership debts in the amount of $12,500. The present controversy centers around the tax treatment of these losses. On his 1971 income tax return petitioner deducted these amounts as a business loss sustained by his sole proprietorship. At trial and on brief petitioner asserts that the losses were theft losses arising from embezzlement of business receipts by Evans in 1971. Respondent, on the other hand, contends that the losses are losses arising from the exchange of petitioner's partnership interest in 1972. We turn first to petitioner's treatment of the losses as losses incurred from the operation of a sole proprietorship. Petitioner asserts that the motorcycle operation was conducted by him as a sole proprietorship. Respondent, on the *308 other hand, asserts the motorcycle operation was conducted as a partnership. We agree with respondent. Petitioner's contention is that although he and Evans intended to form a partnership and in fact executed Articles of Partnership, they never consummated their agreement. [5] In support of this contention, petitioner relies totally upon the fact that Evans never honored his agreement to make a capital contribution of $6,000 to the partnership. We are of the opinion that petitioner's reliance is misplaced. The crucial fact is that on April 23, 1971, petitioner *309 and Evans entered into a partnership agreement and thereafter conducted the motorcycle operation as a partnership. In June petitioner realized that Evans was not going to make a capital contribution to the business. At this point petitioner decided to sever his relationship with Evans. However, petitioner and Evans had up to that point conducted the operation as a partnership. Each had contributed services to the partnership and each had contributed his interest in the original inventory of the motorcycle shop to the partnership. Evans' failure to fulfill his commitment cannot detract from these facts. Moreover, no credible evidence was presented to show that the formation of the partnership was in any way contingent upon Evans' commitment to make a capital contribution. On the contrary, the evidence demonstrates that a partnership was formed and conducted business during 1971. Petitioner also asserts that even if a partnership existed for purposes of Federal income taxation, the partnership was dissolved in 1971 and the losses he sustained from his involvement in the partnership are ordinary business losses. [6] In support of his assertion, petitioner points to his decision *310 in June 1971 to open his own motorcycle shop in Stillwater, Oklahoma, and to terminate his relationship with Evans. On the other hand, respondent contends that petitioner's decision to terminate the partnership is irrelevant for purposes of determining the character of any losses petitioner realized from his involvement in the partnership and the date those losses arose. Respondent argues that sections 708 and 741 govern these questions, that the partnership did not terminate within the meaning of section 708 in 1971, and that any loss sustained is a capital loss. Section 708(a) provides that an existing partnership shall be considered as continuing if it is not terminated. Section 708(b) provides that a partnership shall be considered terminated only if no part of the business continues to be carried on by any of the parties or if a sale or exchange of 50 percent of the partnership capital occurs within a 12-monty period. Moreover, under section *311 741 gain or loss realized upon the sale or exchange of a partnership interest is generally considered gain or loss from the sale or exchange of a capital asset. [7]
The facts herein demonstrate that the partnership continued some limited operations into 1972. On April 23, 1971 Articles of Partnership for Evans-Harrell Shawnee Motorcycles were signed. Thereafter the parties operated the motorcycle business as a partnership. Their relationship deteriorated following execution of the April 23 agreement and petitioner initiated steps to extricate himself from the operation. However, because of a recurrent heart condition, petitioner was unable to do so during 1971. On December 27, 1971, petitioner first took legal steps to dissolve the partnership. On that date he wrote Evans advising the latter that he "[proposed] to wind up the partnership." Thereafter, on January 3, 1972, he filed a petition in State Court requesting an accounting of partnership assets. After receiving a favorable ruling on his petition, petitioner operated the Shawnee shop for approximately one week in January during which time he attempted to wind *312 up the partnership business operations. Subsequently, on April 8, 1972, he and Evans entered into an agreement whereby petitioner exchanged his interest in the Shawnee shop for Evans' interest in the Stillwater shop. In view of these facts, we conclude that the partnership did not terminate until 1972 and that petitioner therefore did not realize any loss on his investment in the partnership as such in 1971. Rather, he realized any such loss in 1972 when he exchanged his interest in the Shawnee shop for Evans' interest in the Stillwater shop. [8]
Petitioner next asserts that during 1971 his partner Evans embezzled approximately $33,000 from the partnership. [9] Respondent argues that petitioner has failed to establish that Evans embezzled monies from the partnership or that no reasonable prospect of recovery of the embezzled funds existed in 1971.We agree with respondent's contention that petitioner has failed to establish that any partnership receipts were embezzled by Evans, and we do not reach respondent's alternative contention. *313 Section 165(a) allows a deduction for losses sustained during the taxable year and not compensated for by insurance or otherwise. Section 165(e) provides that for purposes of section 165(a) any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss. However, if in the year of discovery of a theft there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no deduction is allowed until it is reasonably certain that such reimbursement will not occur. Scofield's Estate v. Commissioner,266 F. 2d 154 (6th Cir. 1959), affg. 25 T.C. 774 (1956). See section 1.165-1(d)(3), Income Tax Regs.
The term theft includes larceny, embezzlement and robbery. Sec. 1-165-1(d)(3), Income Tax Regs. However, whether particular conduct constitutes a theft is determined by the law of the state where the loss was sustained. Paine v. Commissioner,63 T.C. 736, 740 (1975), *314 affd. per order 523 F. 2d 1053 (5th Cir. 1975). The only evidence regarding the alleged embezzlement was petitioner's testimony that it was his belief that Evans sold the motorcycles and, rather than depositing the receipts in the partnership's bank accounts, kept these proceeds. Petitioner also testified that he believed that Evans used these monies to obtain an interest in a race track in Oklahoma City. Aside from this testimony (which reflected only petitioner's suspicions), no evidence supports petitioner's claim that his partner embezzled partnership funds. In light of this fact we conclude that petitioner has failed to establish that partnership assets and receipts were embezzled by Evans. [10] See Arcade Realty Co. v. Commissioner,35 T.C. 256, 263 (1960). *315 Notwithstanding all this, we still find ourselves unable to agree with respondent's conclusion. The difficulty with respondent's contention is that it leaves out of account the fact that petitioner was entitled to deduct as an ordinary loss on his 1971 return his distributive share of partnership losses for that year. The partnership taxable year was the calendar year. Under section 702, petitioner's share of partnership losses for 1971 flowed through to petitioner on his 1971 return. Respondent has determined that petitioner's distributive share of partnership loss for 1971 was $1,289.24. We cannot, however, escape the conclusion that this determination was grossly in error. #' The records are unfortunately very incomplete and sketchy, in part as a result of petitioner's having been denied access to the partnership records by Evans. However, the record contains sufficient data to establish that petitioner's share of the partnership losses for 1971 was not less than $33,717 (the aggregate amount deducted in the four years in issue). In order to ascertain petitioner's share of the loss, we must consider first what were the total partnership losses for 1971 and secondly what *316 was petitioner's distributive share thereof. On the first point it is clear that by April 8, 1972, petitioner had lost all or substantially all of his investment of $33,778.31 in the business. His aggregate losses in the business included his $33,778.31 investment, the $12,500 judgment against him in favor of BSA, and possibly a further $4,500 owing to Lee-Way Freight. (The record discloses that Lee-Way filed an action against him in that amount, but does not disclose the outcome of that action.) The first question is how much of the $46,278.31 or more which petitioner lost in the business represented 1971 losses rather than 1972 losses. By the end of 1971, the partnership was in desperate straits. Petitioner had filed an action for an accounting and liquidation on January 3, 1972, and he took control of the shop and tried to close it down in January. By some means, not disclosed in the record, Evans regained control and petitioner transferred his interest to Evans on April 8, 1972 for a promised $2,500 consideration, which Evans never paid, plus some undisclosed interest Evans had or claimed in J and J Cycles. We wish the record were clearer on the point, but recognize petitioner's *317 difficulties in getting precise data from Evans, whom petitioner strongly suspected of embezzlement. Evans could not be located by either party at the time of trial. Based on the entire record, however, we believe that the preponderance of the evidence established that all of petitioner's investment had been effectively lost by the end of 1971. In view of the litigation against Evans commencing January 3, 1972, there is no practical question but that the business was dead or dying by that time even though no formal funeral rites were observed until April. The partnership return filed by Evans, if adjusted to reflect the true partnership capital accounts, corroborates this view. Although it is undisputed that petitioner invested $33,717 in the partnership in 1971, the partnership return disclosed a capital contribution of only $3,921.69 by petitioner. The partnership return claimed net assets of $5,246.73, but ascribed a value of $7,671 to a dealer's license which in view of the failed condition of the business was of no value. It is clear from the return, considered together with petitioner's undisputed and credible testimony that by the end of 1971 the inventory was very small *318 ($3,500 was an outside fiqure), that liabilities substantially exceeded those disclosed on the partnership return, and that all of petitioner's $33,717 investment in the business had been lost. The next question is the appropriate characterization of the partnership losses in 1971. The record adequately supports, and we draw, the inference that by December 31, 1971, petitioner's investment was gone beyond recall; petitioner, however, was unable to tell exactly where it went. We do not, however, believe that he has the obligation to establish this, because all of the plausible alternative explanations lead to the same conclusion--the loss was deductible by the partnership. First, the loss may have been, as petitioner believes, a simple embezzlement by Evans. If so, Evans was not acting in his capacity as a partner; he had no authority to steal. In such case, the partnership would have been as entitled to deduct the loss as if a non-partner had committed the embezzlement. See section 707(a). The right to deduct embezzlement losses is dependent upon the absence of any reasonable prospect *319 of recovery as of the end of the taxable year. Section 1.165-1(d)(2)(i), Income Tax Regs. The record establishes, however, that despite repeated efforts by petitioner, Evans had not made any part of his agreed capital contribution to the partnership, and that petitioner had effectively abandoned the effort to get him to do so, having written Evans on December 27, 1971, that he proposed to wind up the partnership. We are satisfied on the record as a whole that it would have been an exercise in futility to seek any recovery from Evans. If the losses indeed resulted from embezzlement, they were deductible by the partnership. Similarly, if the losses resulted from simple business misfortunes, they would also clearly have been deductible in 1971. Finally, it could be argued that Evans withdrew the money with the expectation of repaying it, so that as of the end of 1971 there was a mere borrowing transaction. Such analysis, however, would be inconsistent with the partnership return filed by Evans. He showed therein no such debt by himself to the partnership, and failed to disclose thereon petitioner's advances to the partnership as capital contributions. *320 Moreover, nothing in the partnership agreement authorized such unilateral withdrawals, particularly by a partner who had yet to contribute any of his own agreed share of partnership capital. We can only conclude that if Evans did withdraw the money for his own use, it was without the intention or expectation of repayment and was not an authorized withdrawal. It was in contravention, and not in exercise of rights, under the partnership agreement. It would necessarily have been an embezzlement. Cass v. Commissioner,16 B.T.A. 1341 (1929)
Since under any reasonable factual hypothesis the money invested by petitioner in the partnership had been irretrievably lost by December 31, 1971, we find that petitioner has established by a preponderance of the evidence that the partnership had losses in 1971 of not less than $33,717 (the amount needed for 1971 and the three carryback years). The next question is what is petitioner's distributive share of those 1971 partnership losses. The partnership agreement called for an equal division of losses between petitioner and Evans. This agreement, however, was based on the concurrent agreement to make equal capital contributions. *321 In fact, Evans contributed nothing to the partnership. All of the capital came from petitioner. The record does not disclose what modification of the loss-sharing formula, if any, was occasioned by Evans' delinquency. It is clear, however, that since petitioner put up all the capital which was lost, the entire economic burden of the losses fell on him. he in fact incurred the losses and, in the absence of any clear indication to the contrary, we infer from the existing agreement the intention to allocate losses in proportion to capital contributions, so that all or substantially all of the losses were properly deductible by petitioner on his 1971 return.The partnership agreement was silent on what modification in the allocation provisions would occur should one partner fail to contribute his share of the capital. It hardly seems likely, however, that the agreed equal sharing ratio was intended to, or would be construed to, survive such a complete failure of consideration, so that Evans (despite his own delinquency) would be entitled to half of petitioner's moeny.
We conclude that even though we accept respondent's contention that a partnership existed, petitioner nonetheless *322 was entitled to deduct as his distributive share of partnership losses for 1971 not less than $33,717. In light of our conclusion that petitioner sustained a business loss in 1971, at least as great as he claimed, we conclude that he is entitled to the claimed net operating loss carryback deduction for 1968, 1969 and 1970. Due to concessions, Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during 1971.↩
2. Subsequently, BSA obtained a judgment against petitioner in the amount of $12,500. In addition, Lee-Way Freight filed an action against petitioner to recover $4,500 for motorcycles it had delivered to the Shawnee shop. Petitioner went through bankruptcy.↩
3. The other individual named in the petition was apparently an associate of Evans and was involved with Evans in the operation of a race track in Oklahoma City.↩
4. From the evidence presented at trial, it is not clear what interest, if any, Evans had in J and J Cycles.↩
5. Generally, the existence of a partnership, for purposes of Federal income taxation, depends upon the intent of the parties. The intent of the parties is, in turn, determined from a consideration of all the relevant facts and circumstances. Commissioner v. Culbertson,337 U.S. 733↩ (1949). Since petitioner conceded that he and Evans intended to form a partnership, the sole issue is whether their intent was negated by Evans' failure to make good on his promise to make a $6,000 capital contribution to the partnership.
6. See Horner v. Commissioner,35 T.C. 231 (1960), and Webb v. Commissioner,23 T.C. 1035↩ (1955).
7. The exception to this rule is found in section 751.↩
8. Because of this determination as to when petitioner realized his loss, we need not decide the nature of the loss incurred.↩
9. Petitioner did not assert at trial or on brief that Evans fraudulently induced him to enter into the partnership and make capital contributions to the partnership.↩
10. We also note that the parties each had drawing accounts and that the Evans' alleged theft may have been no more than excess withdrawals.Absent any agreement to the contrary between petitioner and Evans, Evans would be obligated to refund such excess.See 1 Rowley, Partnership 465 (2d Ed. 1960). However, petitioner's total inability to obtain any of the agreed funds from Evans established that only an "incorrigible optimist" would have placed any value on Evans' obligation to repay as of December 31, 1971. See United States v. White Dental Co.,274 U.S. 398↩ (1927).