JOE T. BOYNTON AND HELEN J. BOYNTON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10526–77.    Filed September 24, 1979.

*Robert O. Rogers*, for the petitioners.
*Hans G. Tanzler III*, for the respondent.

RAUM, *Judge:* The Commissioner determined deficiencies in petitioners' Federal income taxes as follows:

| Year | Deficiency | Year | Deficiency |
|------|-----------|------|-----------|
| 1971 | $32,917 | 1973 | $505 |
| 1972 | 1,567 | 1974 | 168,498 |

After concessions, the sole issue for decision is whether petitioner is entitled to deduct as his distributive share of partnership losses all of the losses incurred by the Palm Beach Ranch Groves partnership in the year 1974.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits thereto are incorporated herein by this reference.

Petitioners Joe T. Boynton and Helen J. Boynton, husband and wife, resided in North Palm Beach, Fla., at the time their petition in this case was filed. They filed their joint Federal income tax return for each of the years 1971 through 1974 with the Internal Revenue Service Center, Chamblee, Ga. Petitioner Helen J. Boynton is a party to this case solely because she filed a

joint return with her husband who will sometimes hereinafter be referred to as "petitioner."

On or about October 22, 1973, Robert S. Plimpton (Plimpton) entered into a contract to purchase approximately 1,922.37 acres of land in Palm Beach County, Fla., on which was situated a citrus grove, for a consideration of $1,600 per acre, in cash, for a total of $3,075,632.[1] In addition, as part of the consideration for the property, the buyer was to pay for the fruit on the trees, reimburse the seller for certain expenses, and pay the real estate commission due the broker in the amount of $400,000. Plimpton attempted to obtain financing to close the contract but was unsuccessful. He was advised by one lender that funds for the purchase could be obtained if a financially strong individual with an agricultural background joined in the transaction. Plimpton thereafter approached petitioner with a view to interesting him in participating in the citrus grove purchase. At that time, petitioner was very successful in sugarcane growing and other endeavors, and he had a substantial net worth. Petitioner agreed to join with Plimpton in the purchase.

During February 1974, Plimpton and petitioner organized a partnership known as Palm Beach Ranch Groves for the purpose of purchasing and operating the citrus grove. Pursuant to the undated, written partnership agreement between petitioner and Plimpton, all capital distributions, profits, and losses were to be shared equally by the two partners. It was contemplated that the partnership would obtain the purchase money and initial working capital by partnership borrowing, and that each partner would contribute equally to the partnership any additional funds that might later be needed. Plimpton's contract to purchase the grove was assigned to the new partnership.

On February 28, 1974, utilizing the proceeds of two loans totaling $3,500,000, the grove was acquired by the partnership. Three million dollars of the borrowed funds came from a first mortgage loan from the John Hancock Mutual Life Insurance Co. (John Hancock), and the remaining $500,000 was obtained by

---

[1]The total acreage, the price per acre, and the total consideration were stipulated by the parties. There is an unexplained discrepancy of $160 between the stipulated total and the per-acre price multiplied by the number of acres. In another stipulation, the parties have referred to 1,922.27 acres of land, which, multiplied by the per-acre price, equals the stipulated total price.

loan from the First National Bank & Trust Co. of Lake Worth (First National)[2] secured by a note due petitioner (as trustee) in the amount of approximately $725,000. Petitioner, Plimpton, and their respective wives were all jointly and severally liable for repayment of these two loans. At the time of closing, $3,075,632 was paid for the land, $40,000 for the fruit, $85,500 for reimbursement of maintenance expenses, and $116,000 towards the broker's commission.[3] The remainder of the borrowed funds was to be used as working capital.

To obtain the $3,500,000 of initial debt financing, petitioners and the Plimptons submitted their personal financial statements to the respective lenders. In these statements, the respective net worths of the Plimptons and Boyntons were reported as follows:

| Partner | Net worth per John Hancock statement | Net worth per First National statement |
|---|---|---|
| Plimpton ............ | $922,900 | $974,745 |
| Boynton ............ | 5,353,507 | 7,353,507 |

The financial statements submitted by Plimpton to the two institutions were both dated October 10, 1973.[4] The principal assets included in the statements were a residence valued at $340,000; 6.7 acres of commercial land located in Jupiter, Fla., valued at $370,000 in one statement and $435,000 in the other (this land had been purchased 1 month earlier for approximately $225,000, of which $67,000 was paid in cash and the balance by a purchase money mortgage note due 1 year from closing); stock in Atlantic & Pacific Research, Inc.,[5] valued at $300,000 (the corporation had a book value on December 31, 1973, based on an unaudited financial statement, of approximately $20,000); a boat, antiques, paintings, and miscellaneous personal assets.

---

[2] The bank is also referred to from time to time in the record herein as the "First Marine National Bank & Trust Company." The difference in name is unexplained.

[3] The partners' agreement to assume liability for the $400,000 broker's commission called for the payment of $116,000 at the closing, $95,000 on the first and second year thereafter, and $94,000 on the third year, with interest at the rate of 8 percent per annum on the remaining unpaid balance.

[4] A second financial statement submitted to the bank by the Plimptons, dated Jan. 31, 1975, showed a net worth of $1,524,971.

[5] The Plimptons owned 650 shares of the 850 shares of outstanding stock of Atlantic & Pacific Research, Inc. The 1974 income tax return of that corporation describes Mr. Plimpton as its president and indicates that he devotes "full" time to its business. The remaining shares were owned by members of the Plimpton family. The corporation dealt in a product somewhat akin to a fertilizer, which was described as a "plant growth regulator" that "stimulates plants to increase the size and quality of fruit."

The financial statements submitted by petitioner were both dated January 16, 1974. The discrepancy between the net worths listed in the two statements results from the utilization of book value of approximately $200–$250 per acre to value land owned by three sugarcane and cattle corporations in which petitioners owned stock for purposes of determining the value of the stock reported in the John Hancock statement, whereas a more realistic figure of $1,500 per acre was used for purposes of valuing the stock in the First National statement.

In evaluating the partnership's application for the $3 million loan, John Hancock was particularly interested in whether the partners had sufficient cash flow to service the debt in years during which the grove might operate at a loss.[6] John Hancock would have made the loan to petitioner without Plimpton's participation, but the loan would have been denied if Plimpton had applied alone. The decision to grant the loan, however, was based on the combined balance sheets and income statements of Plimpton and petitioner.

The $500,000 First National loan similarly would not have been approved on the basis of Plimpton's financial statements alone, but it would have been made to petitioner without Plimpton's involvement. First National made no independent investigation of the assets included in Plimpton's financial statement; such an investigation would have been conducted if the bank were making a loan solely on the basis of Plimpton's credit worthiness. Because of petitioner's sizeable net worth, the bank would have looked to him first for repayment of the loan if the partnership could not make repayment. However, both the Plimptons and the Boyntons each executed a separate "Special Guaranty" in respect of this loan.

Shortly after the partnership commenced business in 1974, it exhausted its initial borrowed working capital, and an additional $150,000 was borrowed from the Production Credit Association for use in partnership operations. This loan was arranged by taking advantage of petitioner's prior contacts with that organization. The proceeds of the Production Credit Association loan also were quickly expended. Plimpton advised petitioner that the partnership needed additional funds to meet current operating

---

[6]The John Hancock official who investigated the loan stated in his loan report that the projected cash flow from operation of the grove would be insufficient to service the debt in the early years of the partnership.

expenses, and petitioner began making contributions to the partnership on the assumption that Plimpton would put in his share.

In about June or July 1974, it became clear that the grove was not operating as profitably as had been projected. The grove was planted with approximately 800 acres of oranges and 800 acres of lemons. The lack of profitability was in large part due to poor results in lemon production. Both the yield of harvested lemons per tree and the quality of the harvested fruit were much lower than had been expected. Plimpton and petitioner discovered that other growers in Florida were experiencing similar problems with lemons. The problem appeared to be State-wide and of a "permanent" nature to the extent of the quantity and quality of the fruit produced. However, the profitability of the operation could be affected by an improvement in price structure. Moreover, one could not make a reliable projection beyond 1 or 2 years, and the closer it might be to 2 years the less trustworthy it would become. Plimpton revised his financial projections on the basis of the partnership's actual results with the lemon crop, and he concluded that there was no chance at least in the near future that the grove could produce sufficient revenues to repay the partnership indebtedness unless there were a large increase in the market price for lemons or oranges.

During these periods of time, petitioner became concerned with the fact that Plimpton was not contributing his share of the required capital. Plimpton advised petitioner that he had no financial resources and would not be able to come up with any money within the foreseeable future. At that time, the business of Atlantic & Pacific Research, Inc., which was Plimpton's principal source of income, had taken a drastic downturn,[7] and Plimpton could not obtain an offer on the commercial real property located in Jupiter, Fla., which he anticipated selling for a quick profit. In fact, this property was facing foreclosure. In September 1974, the partnership was faced with a need for substantial contributions to meet an October interest payment owed John Hancock in the amount of $135,000.

Petitioner discussed the situation with Everett Nowlen (Nowlen), a certified public accountant who represented him and his

---

[7]Such downturn appears to have been caused in large part by an adverse ruling of the Environmental Protection Agency (EPA), but the business subsequently turned around when EPA changed its position.

business interests, as well as Plimpton and his business interests. He informed Nowlen of Plimpton's statement to him that Plimpton could not support his share of the partnership expenses. Subsequently, Nowlen had conversations with Plimpton concerning this subject. At that meeting, the financial projections for the grove were discussed, and Nowlen concluded that the partnership could not carry its obligations within the near future. He also concluded that Plimpton was not able to carry his part of the financial obligation and that his inability to do so would be of a "permanent" and continuing nature. On the basis of the information available to him regarding the groves, and the financial affairs of petitioner and Plimpton, Nowlen advised petitioner that it would be hopeless to expect Plimpton to cover his share of the investment; that petitioner would have to do it himself; and that the partnership agreement should be modified to reflect the fact that petitioner would be the sole supporter of the partnership for some period of time. The particular modification suggested by Nowlen was that petitioner be allocated the benefit of all (instead of one-half) of the partnership's losses for tax purposes.

On the basis of Nowlen's recommendations, the parties amended the partnership agreement on October 30, 1974. Such amendment provided that whenever one partner made advances in excess of the other partner, the amount of the excess advances would be treated as a loan to the partnership, which loan would have priority of repayment from the next cash distributions actually made. Only one partner at any given time could have a credit balance in his loan account. It was next provided that all of the tax losses of the partnership would be allocated to the partner with the credit balance in his loan account regardless of the amount of the credit balance. The allocation of losses was to affect the method of reporting losses (not profits) for income tax purposes, but not the allocation of economic profits and losses, nor the amounts of distributions in the event of dissolution or sale of the partnership property. For purposes other than income taxes, the preexisting equal division of profits and losses remained in effect. Relevant portions of the amendment to the partnership agreement are as follows:

WHEREAS, the partnership is in need of cash funds to meet its obligations; and

WHEREAS, Boynton is willing to supply such funds by way of loans to the

partnership, but only if he receives the benefit of all partnership losses, until such time as all funds have been returned; and

.  *        *        *        *        *        *        *

## ARTICLE IV–1   PROFITS AND LOSSES

4.11 Except as otherwise provided for determining each partner's share of the partnership income and loss for purposes of the federal income tax, all profits and losses of the partnership shall be allocated equally between the two partners.

4.12 Notwithstanding the provisions of Section 4.11 hereof, the partners recognize that Boynton will be required to make cash available to the partnership from time to time until such time as it shows a positive cash flow; and that Boynton is the individual to whom the institutional lenders will look for a repayment of the partnership loans if they cannot be satisfied out of partnership funds.

Because of the foregoing, the allocation between them of profits and losses for tax purposes, but not for the purpose of determining their share of distributions (which shall be governed by Section 4.11 hereof), shall be as follows:

(a) The taxable income and/or loss of the partnership under the governing provisions of the Internal Revenue Code of 1954 shall be determined; then

(b) As long as there is a credit balance in either partner's loan account, all losses shall be allocated to such partner;

(c) Gains from the sale of any asset with respect to which the partnership has claimed depreciation, shall be allocated to the partner who received the tax benefit from such depreciation to the extent of the lesser of such depreciation or the amount of gain; and

(d) All other income, gains, profits, and for any year in which there is no balance in either partner's loan account as of the end of such year, losses, shall be allocated in accordance with the ratio for sharing profits and losses.

## ARTICLE IV–2   CAPITAL AND LOANS

4.21 The partners may from time to time make advances to the partnership. To the extent such advances are equal, the amounts thereof shall be credited to each partner's capital account.

4.22 The amounts by which the total net advances made by one partner exceed the total net advances made by the other partner, shall be treated as loans to the partnership by the partner making such excess advances; and shall bear interest at the rate of nine (9%) percent per annum. Such interest shall be paid as funds are available.

## ARTICLE IV–3   DISTRIBUTIONS

4.31 From time to time, the partnership shall distribute to its partners, in proportion to their interest in partnership profits and losses, all of its available cash. All such distributions shall be made to and among the partners and divided among them on the basis of their respective interests in the profits of

the partnership, and no cash distributions shall be made to any partner except in repayment of loans and/or interest thereon, unless a proportionate amount, according to their respective interests in the partnership profits, is distributed to the other partner.

\* \* \* \* \* \* \*

4.33 No cash shall be considered available until all amounts advanced by a partner and treated as loans have been repaid; it being understood that all advances treated as loans and the interest thereon are to be repaid before any cash distributions are made to the other partner.

## ARTICLE IV–4  ACCOUNTING

4.41 The partnership shall maintain a capital, loan, drawing, and income account for each partner.

4.42 The income account of each partner shall be debited or credited with such partner's share of the profits and losses allocated in the manner specified in section 4.11 hereof.

4.43 All advances by the partners to the partnership shall be treated in the manner specified in Article IV–2 hereof. All distributions to a partner shall be treated as repayments of a partner's loans to the extent thereof, and any excess shall be charged to such partner's drawing account.

4.44 The different allocations of profits and losses for tax purposes *shall not effect* (sic) [emphasis added] or be considered as a part of the partnership accounting, the sole purpose of such differing treatment being to allocate losses for tax purposes to the person who will suffer such losses in the event the partnership does not later make sufficient income to meet its obligations.

Nowlen expected the partnership to sustain losses in 1974. His recommendation concerning the allocation of tax losses was predicated in large part on his belief that, given Plimpton's weak financial situation, petitioner would have to support the partnership without help from Plimpton at least in the immediate future and bear the risk of being called upon personally to repay the partnership loans. At the time the recommendation was made, Nowlen knew that Plimpton would report approximately $40,000 of income for the year 1974, and that petitioner had received or anticipated receiving at least several hundred thousand dollars of ordinary income in 1974.[8] Nowlen never

---

[8]Petitioner's adjusted gross income in the years 1971 through 1974 (excluding the net operating losses from the Palm Beach Ranch Grove partnership), was as follows:

| Year | Adjusted gross income | Year | Adjusted gross income |
|------|-----------------------|------|-----------------------|
| 1974 .......... | $675,153 | 1972 .......... | $142,288 |
| 1973 .......... | 272,959 | 1971 .......... | 110,765 |

Dividends from a closely held corporation controlled by petitioner accounted for $272,620 of the gross income reported in 1974. The maximum dividends reported by petitioners in any of the preceding 3 years from all sources was $5,682.

recommended a change in the allocation of economic profits or losses to give petitioner a greater economic share of the partnership.

Plimpton and petitioner both thought the partnership amendment was fair for the reasons advanced by Nowlen. A reduction of Plimpton's economic interest in the partnership was not favored because the partnership desired to retain Plimpton's goodwill. Petitioner was aware of, and sought, the tax advantage that would arise in his favor under the modified partnership agreement. Petitioner would have continued making capital contributions to the partnership even without the inducement of the tax benefits; petitioner felt that he had no choice in the matter because of his personal liability for the partnership's obligations.

During the year 1974, petitioner's contributions to the partnership exceeded those made by Plimpton by $123,474.81. The excess contributions were reclassified as a loan consistent with the amended partnership agreement. Because of this $123,474.81 credit balance in petitioner's loan account, all of the ordinary loss of $730,592 reported by the Palm Beach Ranch Groves partnership in 1974 was allocated to petitioner.

After petitioner realized that the grove was not profitable and that he would be required to support the partnership for the foreseeable future, he caused the commencement of efforts to sell the property. Such efforts were initiated as early as the fall of 1974. A bona fide offer for the property was not obtained until 1977. On March 8, 1977, the partnership sold the citrus grove, excluding the fruit on the trees, for $3,570,000. The citrus fruit, retained by the partnership, was placed in a citrus pool for sale. As a part of the sale contract, Plimpton was required to continue managing the grove on behalf of the purchaser for $1,900 per month. Plimpton believed that this requirement was detrimental to him. Before the sale was finally agreed to, petitioner had been concerned that Plimpton would not consent to the sale unless he received additional compensation for undertaking the management obligation. Accordingly, an under-

---

In contrast, the Plimptons reported adjusted gross income in the years 1971 through 1974 as follows:

| Year | Adjusted gross income | Year | Adjusted gross income |
|------|----------------------|------|----------------------|
| 1974 .......... | $44,773 | 1972 .......... | $41,220 |
| 1973 .......... | 109,389 | 1971 .......... | 44,179 |

standing was reached whereby Plimpton would receive all of the proceeds from the citrus pool remaining after the partnership's liabilities, excluding partnership liabilities to petitioner, were satisfied. This amount was estimated to be $15,000 to $30,000. However, the citrus pool payments turned out to be much larger than expected, and $85,000 to $90,000 remained after satisfaction of the partnership liabilities (other than those owed to petitioner). Petitioner and Plimpton agreed to and did split this money evenly. No other funds were ever recovered by petitioner from the partnership.

From the commencement of the partnership through 1977, petitioner made unmatched cash contributions to the partnership aggregating $1,121,066.16.[9] During the same period, the partnership incurred losses in the amount of $1,191,186.78, all of which were allocated to petitioner. By the end of 1978, petitioner's tax losses and cash losses were exactly equal.

Petitioner was advised by his attorney that he had a right of contribution under Florida law against Plimpton in respect of the loans he made to the partnership. Petitioner has never relinguished this right pursuant to an agreement with Plimpton. Plimpton informed petitioner more than once that he felt himself to be under no obligation to repay any of the partnership's losses. Because of Plimpton's feelings in this regard and petitioner's belief that Plimpton lacked sufficient assets to pay, petitioner has made no efforts to enforce his right of contribution.

In his 1974 return, petitioner deducted $732,592 as his distributive share of the net losses of the Palm Beach Ranch Groves partnership for the year 1974. Petitioners claimed a net operating loss for the year 1974 in the amount of $59,366.02,[10] which was carried back to prior years. Tentative carryback refunds were granted for the years 1971 and 1972 in the amounts of $32,917 and $1,567, respectively. The Commissioner determined that petitioner's distributive share of the 1974 loss of the Palm Beach Ranch Groves partnership was only half of the partnership's loss, or $366,296, rather than the full $732,592

---

[9]Petitioner's excess cash contribution in years after 1974 were not classified as loans, but were treated as contributions to partnership capital for accounting purposes.

[10]Petitioners have conceded that the Commissioner correctly increased petitioners' 1974 taxable income by $4,396.98. Accordingly, the $63,763 net operating loss deduction claimed in petitioners' application for tentative carryback refund has been reduced to $59,366.02 for purposes of this case.

claimed on the 1974 return. He further determined that the 1971 and 1972 tentative carryback refunds should be "recaptured" in full since the adjustment to petitioner's 1974 distributive share of the partnership loss eliminated the net operating loss claimed for that year.

## OPINION

The only issue for decision is whether the 1974 amendment to the partnership agreement, purporting to allocate all of the tax losses of the Palm Beach Ranch Groves partnership to petitioner, was a bona fide allocation of losses within the meaning of section 704, I.R.C. 1954. Stated differently, we must determine whether the amended partnership agreement in fact increased petitioner's distributive share of the partnership's losses from 50 percent to 100 percent. We think that it did not, and hold that petitioners may not deduct more than half of the partnership losses suffered in 1974.

Partners are required by section 702(a)[11] to report their "distributive share[s]" of partnership "taxable income or loss," section 702(a)(9), as well as their distributive share of specified items enumerated in sections 702(a)(1)–702(a)(8). The partners enjoy wide latitude under section 704[12] to fix their respective

---

[11] SEC. 702. INCOME AND CREDITS OF PARTNER.

(a) GENERAL RULE.—In determining his income tax, each partner shall take into account separately his distributive share of the partnership's—

(1) gains and losses from sales or exchanges of capital assets held for not more than 6 months,

(2) gains and losses from sales or exchanges of capital assets held for more than 6 months,

(3) gains and losses from sales or exchanges of property described in section 1231 * * *

(4) charitable contributions * * *

(5) dividends with respect to which there is provided an exclusion under section 116, or a deduction under part VIII of subchapter B.

(6) taxes, described in section 901, paid or accrued to foreign countries and to possessions of the United States,

(7) partially tax-exempt interest on obligations of the United States * * *

(8) other items of income, gain, loss, deduction, or credit, to the extent provided by regulations prescribed by the Secretary or his delegate, and

(9) taxable income or loss, exclusive of items requiring separate computation under other paragraphs of this subsection.

Sec. 702(a) has been amended for years subsequent to the years at issue by the Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1520.

[12] SEC. 704. PARTNER'S DISTRIBUTIVE SHARE.

(a) EFFECT OF PARTNERSHIP AGREEMENT.—A partner's distributive share of income, gain, loss, deduction, or credit shall, except as otherwise provided in this section, be determined by the partnership agreement.

(b) DISTRIBUTIVE SHARE DETERMINED BY INCOME OR LOSS RATIO.—A partner's distributive share of any item of income, gain, loss, deduction, or credit shall be determined in accordance with his

distributive shares in the partnership agreement, but this discretion is not unlimited. For example, a partnership agreement that purports to fix distributive shares of *items* enumerated in section 702(a)(1) through (8) by making a "special allocation" of those items to certain partners will be ineffective for tax purposes if the principal purpose of the allocation is the avoidance or evasion of tax. (See sec. 704(b)(2).) The Commissioner has conceded that as a matter of statutory construction section 704(b)(2) is inapplicable to this case which involves an attempted allocation overall or "bottom line" losses described in section 702(a)(9) rather than an allocation of any of the "items" described in section 702(a)(1)–702(a)(8). See generally *Holladay v. Commissioner*, 72 T.C. 571, 586–587 (1979), for the rationale of the Commissioner's concession in respect of the inapplicability of section 704(b)(2) to allocations of section 702(a)(9) "bottom line" taxable income or loss.

However, the power of the partners to fix their *overall* "distributive" shares is subject to another and more sweeping limitation, namely, that the purported allocations of income and losses nominally made in the partnership agreement must be bona fide in the sense that they are genuinely in accord with the actual division of profits and losses inter sese which the partners have in fact agreed upon among themselves. Thus, if provisions of the partnership agreement itself effectively spell out how the profits are *required* to be divided and how the losses are *required* to be borne, the "distributive" shares of the partners will be determined in accordance with such provisions, rather than by an artificial label in the agreement which characterizes as

---

distributive share of taxable income or loss of the partnership, as described in section 702(a)(9) for the taxable year, if—

(1) the partnership agreement does not provide as to the partner's distributive share of such item, or

(2) the principal purpose of any provision in the partnership agreement with respect to the partner's distributive share of such item is the avoidance or evasion of any tax imposed by this subtitle.

Sec. 704 was amended for the taxable years beginning after Dec. 31, 1975, by sec. 213(d), Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1548. The Senate Finance Committee report indicates that the amendment was not intended to permit any inference to be drawn as to the propriety or impropriety of allocations of partnership income or deductions under prior law. S. Rept. 94–938, pp. 100–101 (1976), 1976–3 C.B. (Vol. 3) 49, 138–139. See *Holladay v. Commissioner*, 72 T.C. 571, 586 n. 7 (1979). However, it does seem that the amendment would be applicable to any partnership losses which petitioner may have claimed for 1976 and 1977.

"distributive" an entirely different allocation of profits and losses, and which has meaning in terms of the partnership agreement only in respect of the partners' liability to the Internal Revenue Service. This does not mean that the partners are precluded from fixing their distributive shares in any manner they choose. What it does mean is that in construing the partnership agreement, the formula which *they* select for actually dividing profits and apportioning losses among themselves will be determinative of their "distributive" shares, rather than a different formula arbitrarily included in the agreement which is to be applicable only for the purpose of filing income tax returns, and which is to have no legal consequences in respect of their rights against one another. In short, where one provision of the agreement which purports to characterize as "distributive" a certain division of profits and losses is contradicted by another provision which legally fixes the rights of the partners inter sese, it is the latter provision, rather than the former, which establishes the "distributive" shares of the partners within the meaning of the statute. The overriding principle is sometimes referred to as the doctrine of "substance over form," or is alternatively described as the "economic substance" test. See, e.g., 1 A. Willis, Partnership Taxation, sec. 25.11, pp. 316–319 (1976).

This approach in the interpretation of the meaning of the statutory words "distributive share" first appeared in *Kresser v. Commissioner*, 54 T.C. 1621 (1970). The vitality of the doctrine in cases involving allocations of section 702(a)(9) taxable income or loss has been recently reaffirmed in *Holladay v. Commissioner, supra*.[13] Under *Kresser* and *Holladay,* a partnership agreement that purports to set forth distributive shares of bottom line income or loss will not be respected for tax purposes unless the distributive share provisions of the agreement constitute a bona fide allocation of income or loss between the partners, rather than an allocation having no consequences of substance in the partnership agreement other than the desired tax consequences. *Kresser v. Commissioner, supra* at 1632. "[F]or allocations of partnership bottom line income or loss to be bona fide for

---

[13]For another recent case applying the substance over form or economic substance test to disallow an attempt to allocate 100 percent of a partnership's bottom line tax loss to certain partners, see *Sellers v. Commissioner,* 36 T.C.M. 305, 317–319, 46 P–H Memo T.C. par. 77,070 (1977), affd. on other issues 592 F.2d 227 (4th Cir. 1979).

Federal tax purposes the allocations must accurately reflect the economic basis upon which the partners have agreed to share the profits and losses." *Holladay v. Commissioner, supra* at 587. *Kresser* and *Holladay* establish that the term "distributive share" as used in section 702(a)(9) refers to each partner's agreed-upon share of the economic profits and losses, not to the basis upon which the partners might agree to report income or claim losses on their individual returns.[14] We think that this case is not fairly distinguishable from *Kresser* and *Holladay*.

An examination of the amendment to the partnership agreement reveals that the allocation of 100 percent of the tax losses to petitioner in no way changed petitioner's economic stake in the venture, and did not reflect the economic basis upon which the partners agreed to share profits and losses. Article 4.11 of the amendment states that all profits and losses shall be allocated equally between the two partners, in the same manner as before the amendment, except for purposes of the Federal income tax. Article 4.12 sets forth the mechanism for the allocation of tax losses whereby any partner who makes advances to the partnership that are not matched by the other partner (such excess advances are deemed to be "loans") shall be entitled to the tax losses of the partnership (not the taxable income) regardless of the amount of that partner's unmatched advances. Articles 4.12 and 4.44 expressly provide that the different allocation of losses for tax purposes has no effect on the partners' respective shares of partnership distributions or on partnership accounting; the equal division of profits and losses under article 4.11 controls for purposes other than taxes. Nothing in the partnership agreement relieves Plimpton of his obligation under article 4.11 to bear half of the economic losses that might be realized by the partnership upon sale of the grove or liquidation of the partnership. Florida partnership law gives petitioner a right of contribution against Plimpton whereby

---

[14]See *Sellers v. Commissioner*, 36 T.C.M. at 318, 46 P–H Memo T.C. par. 77,070 at p. 77–320, where it was stated:

"The documents to which petitioner directs our attention establish beyond serious question that the partners agreed that John Sellers would claim the taxable losses of the partnership for 1964 through 1966 on his individual returns. However, it is the basis on which partners agree to share the economic profits and bear the economic losses of the partnership that determines their distributive shares of taxable income and loss, not the basis on which they might agree to report income or claim losses on their individual returns."

Plimpton could be compelled after liquidation of the partnership to pay over sufficient funds to equalize the economic losses suffered by each partner.[15] The partnership agreement is silent as to the rights of the partners against each other if the losses sustained by each of the partners are not equal after dissolution, and the law of Florida in this respect must be deemed a part of the partnership agreement. Sec. 1.761–1(c), Income Tax Regs. Petitioner was advised of this right of contribution by his attorney.

In short, the amended partnership agreement attempts to allocate 100 percent of the partnership's tax losses to petitioner while at the same time allocating to petitioner only 50 percent of the economic losses. Such a tax allocation is impermissible under *Kresser* and *Holladay*. The distributive shares of the tax losses must be determined in accordance with the partners' agreement to share economic profits and losses equally. We conclude that petitioner's distributive share of the 1974 partnership tax loss was 50 percent.

Petitioner attempts to avoid the result dictated by *Kresser*, *Holladay*, and similar cases by arguing that the "real agreement" between the partners in light of the economic realities at the time of the amendment to the partnership agreement was that petitioner would bear 100 percent of the losses. The short answer is that we do not believe that there was any such "real agreement" between petitioner and Plimpton. The amended partnership agreement was executed on October 30, 1974, in the light of Plimpton's financial situation at that time and the expectation that petitioner alone would continue at least during the immediately foreseeable future[16] to make advances to the

---

[15]Fla. Stat. Ann. sec. 620.645(1) (West 1977)(identical to sec. 18 of the Uniform Partnership Act) states that subject to any agreement between the partners, each partner shall be repaid his contributions to the partnership, whether by way of capital or advances, and that each partner must contribute to the partnership's losses according to his share in the profits. Fla. Stat. Ann. sec. 620.755(1)–(4) (West 1977)(identical to sec. 40 of the Uniform Partnership Act) requires that if the partnership assets are insufficient upon dissolution of the partnership, each partner must contribute his share under sec. 620.645(1) of the amount necessary to satisfy the partnership liabilities, including those owing to creditors other than partners and to partners for advances and capital. Thus, these statutes authorize petitioner to recover from Plimpton half of any unpaid partnership liabilities, including petitioner's advances to the partnership, and half of any other losses sustained by the partnership. See generally A. Bromberg, Crane and Bromberg on Partnership 367, 369–370, 507 (1968).

[16]It is true that the word "permanent" is used in the testimony from time to time, not only with respect to Plimpton's financial circumstances but also with respect to the prospects of profitable operation of the citrus grove and the possibility of recouping losses in the future. However, we are satisfied that such conditions were not permanent in any literal sense, and were not inconsistent with

enterprise. Yet, the provisions of the agreement are unmistakably clear. While they set forth a scheme of priorities in respect of repayment of the advances, they leave clear beyond any reasonable doubt that any possible profits are to be divided equally and that both partners are to be equally accountable for losses. We do not believe that there was any contemporaneous oral understanding that these provisions do not mean what they so plainly declare. Nor do we believe that there was any subsequent modification, notwithstanding Plimpton's unilateral statement that he did not regard himself bound.[17] So far as this record shows, petitioner never released Plimpton from his obligations.

*Harrell v. Commissioner,* 37 T.C.M. 911, 916–917, 47 P-H Memo T.C. par. 78,211 (1978), relied upon by petitioner, is distinguishable. In *Harrell,* a partnership agreement called for an equal division of losses between the two partners and for equal capital contributions by each. One partner contributed no capital, however, and the agreement was silent as to the effect of that partner's delinquency on the loss-sharing ratio. We inferred an intention to allocate losses to the party who made all of the capital contributions. In contrast, the amended partnership agreement in this case was specifically intended to reflect the understanding of the partners concerning Plimpton's inability at that time to contribute his share of the needed funds to the partnership, and the amendment expressly provides for an equal sharing of economic profits and losses. We cannot disregard the intention of the parties so clearly expressed in the amendment.

Petitioner emphasizes the fact that up to the time of the hearing he had not recovered any portion of the losses from Plimpton. Superficially, this circumstance is very appealing but reflection will demonstrate that there is no merit to the point. In the first place, to the extent that petitioner is now out-of-pocket in respect of his advances he remains entitled, either as a

---

a possible improvement in the economic climate from the recession lows of 1974 and 1975 that would materially change the picture. The record certainly contains no satisfying proof of Plimpton's insolvency, and we were impressed with his business resiliency. Hence, we have concluded that the words "immediately foreseeable future" more accurately characterize the situation than does the word "permanent."

[17]Any such possible subsequent modification would, of course, be subject to the requirement in sec. 761(c) that it be "made prior to, or at, the time prescribed by law for the filing of the partnership return for the taxable year (not including extensions)" and that it be "agreed to by *all* the partners, or * * * adopted in such other manner as may be provided by the partnership agreement." (Emphasis supplied.)

creditor or as a partner, to be reimbursed by Plimpton for the latter's allocable one-half share. And the only matter before us in this case is whether petitioner has a valid claim to deduct all rather than one-half of the partnership's $730,592 loss for 1974. Although, as a matter of partnership tax law, his deductible loss for 1974 is limited to his distributive one-half share of that loss, this does not mean that he will not obtain a tax benefit in respect of the other one-half if he does not ultimately obtain reimbursement from Plimpton. The matter may be primarily one of timing.

We know of no basis upon which Plimpton can be relieved of his liability to make petitioner whole in respect of that one-half of the loss, and no such basis has been suggested to us on behalf of petitioner. The only point that is made is petitioner's conclusion that it would be futile to pursue his rights against Plimpton in view of the latter's stated, but apparently thoroughly unsound, position that he is not obligated to petitioner. The record does not establish that Plimpton is a deadbeat, or that one would have to be an "incorrigible optimist" *(White Dental Co. v. United States,* 274 U.S. 398, 403 (1927)) to press one's claim against him. Nor is there even any evidence that Plimpton is insolvent. To the contrary, although he suffered financial reverses, there is no indication that he does not have significant assets, and the record affirmatively shows that there has been a turn-around in the fortunes of his corporation (Atlantic & Pacific Research, Inc.).[18] If and when petitioner's rights against Plimpton should become worthless, either in whole or in part, an appropriate deduction will be available to him at that time.

---

[18]Plimpton's net worth statements as of Oct. 10, 1973, and Jan. 31, 1975, showed an excess of assets over liabilities in amounts of over $900,000 and over $1,500,000, respectively. Although his net worth may have been overstated therein, and although he thereafter sustained financial reverses with respect to his corporation and his real property in Jupiter, the record fails to show how much he may have realized on the Jupiter property or that the stock in his corporation became worthless. Indeed, the problems relating to his corporation appear to have been caused by an EPA ruling, which was subsequently reversed, and the record shows that the corporation has since acquired valuable contract rights in respect of a certain new product. Moreover, there is no suggestion that Plimpton doesn't continue to reside in a home owned by him which had a stated value of $340,000 in 1973 and 1975 (subject to a mortgage of some $49,000 in 1975), and from all that appears, he is still projecting the image of a wealthy man. A further indication of his lifestyle is reflected in his income tax returns which show charitable contributions in the amounts of $9,242 for 1974, $3,313 for 1975, and $24,922 for 1977. This is hardly the picture of an impecunious person. We have already noted (n. 16 *supra*) our impression as to his resiliency in business affairs, and we cannot conclude in the face of these circumstances that petitioner's claim against him is hopeless. It would certainly be a matter of prudence for someone in petitioner's position to take appropriate steps to preserve his rights against Plimpton.

Meanwhile, there is no basis for allowing petitioner a deduction in respect of the one-half partnership's 1974 loss properly allocable to Plimpton.

*Decision will be entered for the respondent.*